Caspa L. HARRIS, Jr., Plaintiff,

v.

HOWARD UNIVERSITY, INC. d/b/a
Howard University, Defendant.

No. Civ.A. 96–0404(RCL).

United States District Court,
District of Columbia.

Oct. 13, 1998.

Thomas Dann, Hewes, Gelbrand, Lambert & Dann, PC, Washington, DC, for plaintiff.

Michael Wasserman, Sidley & Austin, U.S. Attorney's Office, Washington, DC, Daniel I. Trywes, Pepper Hamilton LLP, Washington, DC, for defendant.

### MEMORANDUM OPINION

LAMBERTH, District Judge.

This case involves a claim for indemnification by plaintiff Caspa L. Harris, Jr., against his former employer, defendant Howard University, for:

(1) the costs of defending claims against Harris by the Federal Deposit Insurance Corporation (FDIC) in its capacity as receiver for Madison National Bank; for the legal fees incurred by Harris in responding to a 1993 investigation by the Office of the Comptroller of Currency (OCC), and for legal fees incurred in seeking indemnification from Howard University;

(2) $80,000 that Harris paid in settlement of certain of the FDIC claims; and

(3) compensatory and punitive damages against Howard University on the ground that Howard's refusal to indemnify him was in bad faith.

The court conducted a bench trial in May 1998. The court now states its findings of fact and conclusions of law.

### I. BACKGROUND

The FDIC's claims against Harris, as well as the OCC investigation, arose out of the alleged acts and omissions of Harris as a director of United National Bank (UNB) of Washington, D.C. The details of Harris's service on the UNB Board, and of the challenged activities, will be discussed in greater detail later.

During certain periods relevant to this case, the Bylaws of the Howard University Board of Trustees required the University to indemnify and "provide counsel" to an officer or managing agent of the University against claims arising out of service by that individual as a director of another corporation if he served on that other corporation's Board at the "request" of the University. However, the Bylaws only extended indemnification under those circumstances "to the extent permitted by law," and only if the officer or

managing agent "acted in good faith for a purpose which [he] reasonably believed to be in the best interest" of the University.

Harris claims that, in his capacity as Vice President for Business and Fiscal Affairs and Treasurer of Howard University, and later as a managing agent of the University, he served on UNB at the request of the University's president, Dr. James Cheek, to represent the University's interests as a major depositor and stockholder in UNB, and to implement the University's policy of supporting banks in the minority community. The University's position is that Harris did not serve on the UNB Board at the request of the University, and was not an officer or managing agent of Howard University after June 30, 1987. The University also argues that Harris does not qualify for indemnification because he failed to satisfy the standard of care required by the Bylaws.

In March 1991, UNB was forced by the OCC to merge into Madison National Bank (MNB), an affiliate of UNB under the common ownership of James Madison Limited (JML). On May 10, 1991, the OCC declared MNB insolvent and appointed the FDIC as receiver.

In January 1993, the OCC wrote to Harris indicating that it was considering assessing civil money penalties against him for purported regulatory violations by UNB in 1990. After Harris responded, the OCC decided in September 1993 not to proceed against him. Harris never informed the University of the OCC investigation until Harris commenced this suit and made demand for indemnification for his legal fees incurred in successfully resolving the OCC matter. The University subsequently declined to indemnify Harris for any legal expenses incurred in responding to the OCC investigation. *See* Joint Pretrial Statement at 3.

In April 1994, the FDIC threatened claims against Harris arising from performance of his duties as a director of UNB. The FDIC's threatened claims arose from: (1) losses incurred on eighteen loan participations purchased by UNB, primarily from MNB (Loan Participation Claims), and (2) losses incurred by UNB in 1986 and early 1987 in connection with an indirect automobile loan program conducted through APA Leasing & Sales, Inc. (APA Leasing Claim).

Harris sought indemnification from the University relating to the FDIC's threatened claims. The University declined to indemnify Harris for the FDIC claims and related costs of defense. On December 19, 1995, Harris entered into an agreement with the FDIC whereby Harris admitted no wrongdoing but agreed to pay the FDIC $80,000 in settlement of the claims involving the Loan Participation Claims. The FDIC and Harris agreed to a tolling of the statute of limitations on the FDIC's remaining APA Leasing Claim.

The University declined to indemnify Harris because it contends that (1) Harris was not requested by the University to serve on the UNB Board during any relevant periods; (2) Harris was not an officer, employee, or other managing agent of the University after June 30, 1987, and is not entitled to indemnification for claims arising in whole or in part from events after that date; and (3) Harris did not act as a UNB director in "good faith" for a "purpose" that he "reasonably" believed to be in the University's "best interest."

Harris claims that the University acted in bad faith by refusing to honor its obligations to defend and indemnify him, because the University had dropped errors-and-omissions insurance coverage for officers and managing agents otherwise indemnified under the Bylaws for serving as directors of for-profit corporations.

Plaintiff seeks (1) a judgment awarding damages of $80,000, plus the costs of his defense to date in connection with the OCC investigation, the FDIC Loan Participation Claims, and the APA Leasing Claim; (2) a declaratory judgment that, with respect to the APA Leasing Claim, the University is obligated to indemnify him for future costs of defense, including reasonable attorney's fees; and (3) his attorney's fees and costs incurred in seeking to enforce the University's indemnification obligation. Plaintiff also seeks to recover compensatory and punitive damages arising from the defendant's alleged tortious breach of the duty of good faith and fair

dealing, with respect to the University's obligation to defend and indemnify.

## II. THE INDEMNIFICATION CLAIM

### A. Was Harris Covered Under the Terms of the Bylaws?

#### 1. Background Concerning Caspa Harris's Service on the United National Bank Board of Directors

Howard University is a federally chartered, private, nonprofit university located within the District of Columbia. Harris was employed by Howard from July 1, 1962 until June 30, 1987. From July 1, 1971 until the date of his retirement, he served as Vice President for Business and Fiscal Affairs, and also as Treasurer. After leaving Howard, Harris served as Executive Vice President, and then President, of the National Association of College and University Business Officers. He ended his employment with the latter organization in 1995.

In 1971, James Cheek, president of Howard University during most of the period relevant to this case, was contacted by officials of the Nixon Administration, who indicated that as part of President Nixon's policy of assisting minority-controlled banks, Howard University should seek one or more local financial institutions in which to deposit funds. On September 17, 1971, Howard's Board of Trustees authorized the use of United National Bank, one of the District of Columbia's two minority-controlled banks, as a depository bank for Howard University funds, and approved the location of a UNB branch on the Howard campus.

On or about October 13, 1971, both Cheek and Harris were elected to the UNB Board. However, Cheek withdrew from the Board shortly thereafter because he was already a director of another national bank. It is stipulated that Harris accepted the UNB position in 1971 without obtaining any prior written approval from the Howard University Board of Trustees, and that, in 1971, Cheek did not make any *written* communication to Harris requesting that Harris serve on UNB's Board as a Howard representative. (Stips.17, 18.)

The banking relationship between Howard and UNB quickly became controversial. On April 28, 1973, the Howard Board of Trustees had a "lengthy and detailed discussion" concerning "the question of possible conflict of interest." (Stip.20.) This debate within the Howard University Board occurred shortly after the filing of a class-action lawsuit alleging that Sibley Hospital trustees had invested hospital funds at unfavorable terms at the banks where they were employed as banking executives. *See Stern v. Lucy Webb Hayes Nat. Training Sch.,* 367 F.Supp. 536, 537 (D.D.C.1973). Harris thereafter submitted his resignation to UNB by letter (on personal letterhead) dated March 13, 1974. (Ex. 254.) In that letter, he stated that his resignation was "due to recent court actions concerning possible conflict of interest or appearance of conflict of interest." Harris did attend two UNB Board of Director's meetings after his resignation: one on May 14, 1974, and one on July 17, 1974. (Stip.22.)

The waters become somewhat murkier at this point, as the circumstances culminating in Harris's rejoining the UNB Board present a central dispute in this litigation. What *is* certain is that on July 1, 1975, Harris wrote to Cheek (on University letterhead), advising him that he had been officially offered a director's seat on the UNB Board effective July 1, 1975. (Stip.24.) The letter asked Cheek to sign the memorandum, which he did, by stamp. (Stip.24.) On September 22, 1975, the Budget and Finance Committee of the Howard Board of Trustees recommended that Harris be *permitted* to accept the appointment with UNB. The full Board of Trustees approved that recommendation five days later. Harris rejoined the UNB Board sometime between September 27, 1975 and October 15, 1975. He served on the board continuously until he resigned sometime on or before September 27, 1990. It is stipulated that the only formal action ever taken by the Howard Board of Trustees respecting Harris's service on the UNB Board was the action in September 1975, and that, prior to 1975, the Howard Board (apart from any action by Cheek) never formally requested that Harris serve on the UNB Board. (Stip.29.)

## 2. The University Bylaws

Harris's claim for indemnity rests primarily upon Article VII, Section 3 of the University's Bylaws, as in effect before September 1988. The Bylaws state, in relevant part:

> To the extent permitted by law:
>
> This corporation shall provide counsel and indemnify any ... Vice President ... [or] other managing agents ... acting consequent to University duties ... made or threatened to be made a party to an action or proceeding ... including an action by or in the right of any other corporation of any type of kind, domestic or foreign, which any of the above named persons served in any capacity at the request of this corporation, by reason of the fact that such person ... was a director or officer, or managing employee, of this corporation, or served such other corporation in any capacity, against judgment, fines, amounts paid in settlement and reasonable expenses, if such person acted in good faith for a purpose which such person reasonably believed to be in the best interest of this corporation ...

(Ex. 315 at 21.) In September 1988, the Bylaws' indemnification provision was changed to permit indemnification of a director of a corporation only where the threatened or actual claims arise "by reason of" the director's affiliation with the University. (Ex. 17 at 8.) As explained in greater detail at Part II.4.b, *infra*, the revisions to the indemnification policy are not relevant to this matter because they took place after Harris left his position as Vice President of the University.

In order to obtain indemnification, Harris bears the burden of proving by a preponderance of the evidence that the requirements of the Bylaws are satisfied. *Cf. Rivers & Bryan, Inc. v. HBE Corp.*, 628 A.2d 631 (D.C.App.1993).

## 3. The University Did Not Admit Liability

Plaintiff argues that the starting point (and, presumably, the ending point) for determining whether indemnification is warranted is that Howard University supposedly "admitted" that Harris qualified for indemnity for the FDIC claims. This alleged "admission" comes from John L. Procope, a trustee and member of the Howard Executive Committee, who apparently told President Cheek in June 1994 that the University would have covered these claims if it had not dropped its directors' and officers' (D & O) insurance coverage in 1987. (Cheek Direct.) Procope's purported "expertise" on this topic was that he was in the business of providing D & O insurance, and that he had in fact provided the D & O insurance for the University before the University decided to change its coverage. More important, plaintiff claims, is that Procope had participated in the May 17, 1994 Executive Committee discussions concerning the indemnification claim.

The court attaches no special significance to the alleged "admission." First, plaintiff has offered no corroboration of Cheek's testimony concerning Procope's statement. Corroboration is particularly critical because Cheek is also facing an FDIC action subject to possible University indemnification, and consequently he is hardly disinterested in relaying this statement. Second, the court has no understanding as to how Procope reached his conclusion that Harris qualified for indemnification: *i.e.*, did Procope carefully review the details of the APA Leasing Claim, the Loan Participation Claims, or, most critically, even consider the meaning of the term "managing agent"? Third, there is no reference to this alleged "devastating admission" in any of the extensive communications made by the attorneys for Harris and Cheek to the University, (Exs.211, 213, 219–20), or in the amended complaint, (Ex. 250), or in any other relevant document in the record. Nor was it referenced by Cheek in his own communications with Procope. (Ex. 369.) If the admission were truly significant, one would expect plaintiff to have made reference to it sometime before trial. Finally, the statement was made to Cheek, about "your claim," creating at least some ambiguity as to whether that statement would extend to Harris as well, since the two joined the UNB Board at different times and under different circumstances.

However, the main reason that Procope's alleged statement is not a "silver bullet" as to indemnification has little to do with its accuracy, or the basis upon which Procope reached his conclusion. The primary reason that the court need attach no special significance to Procope's alleged statement is that it does not constitute an admission of Howard University. The isolated statement of one director of a corporation is not a binding admission of the corporation. "Curbstone admissions or declarations of an individual director have not the effect of binding the corporation in the absence of evidence that authority to make the declarations were duly conferred. If this were not true, then one director's declaration could commit the corporation to a particular course of conduct in defiance of the will of the board." 2A *Fletcher Cyclopedia of Corporations* § 741, at 464 (1992 rev. ed). There is no evidence of any authority conferred upon Procope by Howard University to bind the corporation as to D & O indemnification. Therefore, there is neither a factual nor a legal basis upon which this court may conclude that Procope "admitted" University liability through his uncorroborated statement.

4. Was Harris's Service on the UNB Board After 1975 "at the Request" of the University, and in His Official Capacity?

Pursuant to the Bylaws, indemnification for claims relating to service on another entity's Board is only available if the person served the other entity "at the request of th[e] corporation." (Ex. 315 at 21.) Howard's first defense is that Harris is not entitled to indemnification because the University never requested that he serve on the UNB Board.

Harris contends that his service on the UNB Board both before March 1974 and from 1975 to September 1990 was at the request of the University corporation, in his official capacity as Treasurer of Howard University. Harris claims that the request was made by President Cheek, and that the Board was fully aware of the nature of his service.

Cheek testified unequivocally that he did ask Harris to serve on the UNB Board when

the Howard–UNB relationship was initiated in 1971. (Cheek Direct.) As discussed previously, Harris assumed his seat in 1972 and resigned of his own initiative in March 1974 out of concerns arising from the Sibley Hospital case. (Harris Direct.) Then, in approximately June 1975, Cheek allegedly indicated to Harris that he wanted Harris on the UNB Board to represent Howard's interests. (Harris Direct.) On July 1, 1975, Harris wrote a brief memo to Cheek, seeking approval of UNB's offer to rejoin the Board. (Ex. 49.) Cheek signed the memo by stamp.

The issue of Harris's return to the UNB Board was considered at length at the trustees' Budget and Finance Committee meeting on September 22, 1975. The minutes from the meeting state:

> The Committee was also informed that the United National Bank of Washington, D.C. has offered a seat on its Board of Directors to Dr. Caspa L. Harris, Treasurer, Howard University. The Committee discussed in detail the offer and recommends that Dr. Harris be permitted to accept the appointment after consultation with the General Counsel.

(Ex. 29.) Five days later, the full Board approved this recommendation of the Budget and Finance Committee, "endors[ing] [Harris's] acceptance of an invitation to" serve on the UNB Board. (Ex. 28 at A–7.)

The point of dispute between the parties is whether this permission was granted so that Harris could serve in an individual/personal capacity, or whether his service was at the request of the University and in his capacity as Treasurer/CFO at Howard University. If the latter were true, then Harris would be entitled to indemnity under the Bylaws.

a. Plaintiff's Evidence that the Service Was At the Request of the University, and in His Official Capacity

The first item of evidence offered by plaintiff is the Report of the Budget and Finance Committee. In recommending that Harris be permitted to accept the seat, it refers to him as "Treasurer, Howard University." (Ex. 29.) Also, the endorsement of the full Board referred to "Dr. Caspa L. Harris, Jr.,

Treasurer." (Ex. 28.) Plaintiff contends that the inclusion of the official title demonstrates that the service was to be in his official capacity.

Second, Harris offered a great deal of deposition and trial testimony from Howard trustees and officers indicating that it was their belief that Harris was serving in his official capacity, in order to safeguard University interests. This testimony, of course, must be read through the filter of one of the stipulations in this case: that *"[t]here is no evidence from any HU Trustee that he or she ever heard Dr. Cheek request Harris to serve on the UNB Board."* (Stip 30.) The court will summarize this testimony briefly, though it will not consider any testimony that contradicts that stipulation. *See, e.g.,* Plaintiff's Proposed Findings of Fact at 74 ("Moreover, during Cheek's own discussions with Woods, Cheek indicated to Woods that he had asked Harris to serve on UNB's Board because he himself could not."); *id.* (discussing Cheek's conversations with Dr. Collins).

Cheek is in many respects Harris's key witness, because, if there was any authorization, it came from him. Cheek testified that he did request that Harris serve on the UNB Board, in his official capacity as Treasurer and VP, when the UNB–Howard relationship was first initiated, (Cheek Direct), although there was no writing memorializing this. Cheek also signed (by stamp) Harris's July 1, 1975 letter expressing his wish and desire to "rejoin" the UNB Board. However, Cheek had no specific recollection that in the 1974–75 period he actually asked Harris to rejoin the Board, a point that the court will return to in its consideration of defendant's evidence. Cheek claims that, in his mind, Harris's service on the UNB Board was continuous, so there was no need to "request" him to rejoin. Also, Cheek's memory of events in 1974–75 is cloudy because of family matters.

Dr. William Collins was President of UNB and a member of the Howard Board. There is little question that Collins wanted Harris to return to the UNB Board, (Collins Dep. at 19) (noting that Collins wanted to secure

Howard's banking business), and "invited" him to do so. Collins testified at his deposition that he understood that Harris was serving in his capacity as Treasurer and CFO of the University and that this was common knowledge among members of the Howard Board. (Collins Dep. at 24, 41.) He added that, in his opinion, most clear-thinking members of the UNB Board wanted Harris on the Board.[1] *(Id.* at 31.)

Dr. Carl Anderson was a Howard Vice President. He testified at trial that it was his understanding that Harris preferred to not rejoin the UNB Board because of the considerable conflict-of-interest criticism to which he was subjected, as well as liability concerns, and that Harris had voiced his reluctance a number of times to Anderson. He also stated that it was generally understood that Harris served on the UNB Board to safeguard the University's interests, and that the Board was pleased to have one of its Vice Presidents looking out for Howard's interests. He also testified that he was *not* aware that Harris was serving for personal reasons, or for "public service." (Anderson Direct.)

Owen Nichols was the Secretary to the Board of Trustees, and he testified that it was common knowledge that Harris was serving as a Howard representative and in his official capacity as Treasurer in his UNB service. Nichols stated that the Board approved Harris's service because of his position, and also testified that Harris was on the board because of the University's deposits, and that it would be in the best interest of the school to have Harris on the Bank Board.

Dr. Geraldine Woods was a trustee at Howard dating back to 1968, and chair of the Board from 1975 to 1988. She testified at her deposition that she was fully aware that Harris was serving on UNB's Board at the request of Howard University because *Harris* had told her so on at least two occasions. (Woods Dep. 5–6; 24–25; 28; 31–32.) Woods also understood that Harris was serving on UNB's Board in his capacity as Chief Financial Officer. *(Id.* 6–7, 8–9.) Woods

---

1. Collins also testified that Cheek had indicated to him in numerous conversations that he had requested Harris to serve on the UNB Board.

However, this contention conflicts with a stipulated fact, and therefore will not be considered by the court.

even testified that she thought this service was a good idea. (*Id.* at 7.)

Roger Estep, another Howard VP, testified that it was his understanding that Harris served on the Board in order to safeguard and protect Howard's interests, and that both the cabinet and the trustees had general knowledge that Harris was serving as a Howard representative. To the best of Estep's understanding, Harris was not serving on the UNB Board as a personal business venture or as a public service. (Estep Direct & Re–Direct.)

Finally, there is the testimony of Harris himself. He testified that Cheek had indicated to him that the 1971 directive requesting that he serve on the UNB Board was still in effect in 1975. He also claimed that the reference to "previous discussions concerning my membership" in his July 1, 1975 letter refers to discussions with Cheek during which Cheek asked him to rejoin the UNB Board. Also, Harris testified quite vehemently that he preferred to not rejoin the UNB Board in 1975 on the basis of all the controversy surrounding the relationship, and also that his duties as VP were time-consuming enough.

b. Defendant's Evidence that Harris's UNB Service Was in His Individual Capacity

At the outset, defendant notes that it is undisputed and stipulated that the Howard University Board never voted to *request* that Harris serve on the UNB Board for the benefit of the University. (Stip.28.) The Howard Board "permitted" him to serve on the UNB Board. The defendant claims that the choice of the word "permission" in the minutes—the official record of Board actions—clearly demonstrates that the University was allowing one of its officers to engage in an outside activity. Had the service been "at the request" of the University, the Board minutes would have used those words or similar language.

Second, defendant notes that there is not a single writing from 1972 until 1990 containing *any* reference to the fact that Harris was serving at the request of Howard University (or of Cheek) and in an official capacity. There is no reference to this "request" in several documents in which one might expect to find it, including, *inter alia:* the Howard Board minutes; correspondence electing Cheek and Harris to the UNB Board in 1971, (Ex. 6); correspondence in which Harris resigned from the UNB Board in 1974, (Ex. 254); Harris's 1975 memorandum advising Cheek of Harris's "wish and desire" [2] to join the UNB Board, (Ex. 49); Harris's retirement letter from Howard, (Ex. 64); the annual reports of HU auditors which disclosed that several HU officers or trustees served as directors of financial institutions, (Exs.13, 15, 19), but that did not disclose any special role that Harris played; Harris's personnel file, which did not distinguish between his UNB Board service and other memberships, such as the Red Cross, (Ex. 263); UNB's or JML's annual reports or proxy statements, (Exs.121, 294); UNB's Board minutes, (Exs.354–59); any annual disclaimer statement filed by Harris with UNB concerning conflicts of interest, (Ex. 117 at 5; Ex. 246 at 219); or Harris's letter resigning from the UNB Board, (Ex. 304). In fact, of the hundreds of trial exhibits and thousands of documents produced for this litigation, not one mentions a request to serve. This absence of a writing is especially significant when contrasted with Harris's testimony that he "always put things in writing." (Harris Direct & Cross.)

The University also points to the fact that Harris personally retained most of the director's fees that he received from UNB as proof that his service was a personal enterprise. For example, in 1985, UNB paid Harris $6,000 in director's fees, but he donated only $125 of that total to Howard University. (Stips. 75–76; *see also* Stip. 78 (noting that

---

**2.** The court attaches no special significance to this "wish and desire" language as support for the proposition that Harris was joining the Board of his on accord. That language could just as likely be a polite manner of accepting the invitation, no different than responding to a dinner invitation by stating "I would be delighted to attend," regardless of one's true feelings on the subject. The court does not find that this language would lead the Howard Board to believe that he was joining the UNB Board in his individual capacity.

Harris believed that he had no obligation to turn over any director's fees to Howard University).) Defendant claims that his retention of director's fees suggests that Harris did not view his service on the UNB Board as part of his University responsibilities, because the proper source of compensation for professional duties would be his salary and benefits package. Defendant also notes Harris's testimony that he normally would not accept anything of value from a firm doing business with him in his capacity as Howard's vice president. (Harris Cross.)

Third, Howard claims that Harris's position cannot be reconciled with Board concerns about liability. In light of the fact that Harris's service on the UNB Board would expose the University to considerable indemnity liability, one would expect the precise nature of his service to have been carefully reviewed by the Board, and that the Board would have been explicit in any resolution. The absence of any explicit Board authorization is all the more notable because, at the time of the alleged "request," the Howard Board was acutely aware of conflict of interest problems and taking steps to police relationships with UNB. Because of the Sibley Hospital case, and the vociferous opposition to any official role in UNB by persons like Dr. Watts, the University (and Harris) would have every reason to be explicit about the nature of Harris's service.[3]

Fourth, defendant contends that the trial and deposition testimony fail to support Harris's claim that he was serving at the request of the University or in his capacity as vice President of the University. If anything, the testimony sustains the opposite conclusion. The court will review the salient parts of the testimony briefly.

Defendant places considerable emphasis on the testimony of plaintiff's key witness, Dr. Cheek, because Harris's argument rests in large part upon what Cheek told him and allegedly told other Howard officers and trustees. While Cheek had no doubt that he had requested that Harris serve on the UNB Board in his official capacity back in 1971, he

had no recollection at trial of asking him to rejoin in 1975. Nor could Cheek identify a single trustee he told of this request. (Cheek Exam; Cheek Cross; Cheek Dep. at 170.) Cheek also admitted in his deposition that the fact that Harris was permitted to go on the Board did not necessarily mean that he was serving as a University representative. (Cheek Dep. at 157.)

Defendant goes on to dismiss the testimony of Drs. Nichols, Estep, and Anderson, noting that, whatever they personally may have thought about Harris's service, they all lacked any direct knowledge supporting Harris's basic contention, that Cheek had requested that he serve on the UNB Board.

Howard next points to the trial testimony of Carl Klemme, an HU trustee from 1975 to 1991. While Klemme could not specifically recall the September 22, 1975 meeting of the Howard budget committee meeting at which Harris's rejoining the UNB Board was discussed, he testified that he had no recollection of hearing from Harris or from Cheek that Harris was serving at Cheek's request. (Klemme Direct.) On the other hand, he had never heard that the service was for Harris's personal or public service interests. (Klemme Cross.) He also noted that each year, when the bank relationships were re-approved, Harris would disclose that he was serving as a director of UNB, but would never state that he was doing so at the request of the University. (Klemme Direct.)

John Dellenback was a trustee from 1975 to 1992, and also served on the UNB Board. He testified by deposition that the Howard Board did not request that Harris serve on the UNB Board, stating that "[i]t was neither prescribed nor proscribed in the sense that what he was doing was perfectly in order, but on the other hand, this was not part of the jot and tiddle of what he was expected to do." (Dellenback Dep. at 27.) Furthermore, Dellenback had no recollection of express statements by Harris that he was the University's representative on the UNB Board. (*Id.* at 21.)

---

3. Of course, this cuts both ways, as one would also expect that the University would have been explicit that the service was *not* at its request.

Dr. Charles D. Watts, a trustee from 1973 to 1991, was one of the most vocal critics of Harris's service on the UNB Board. Watts raised issues concerning conflicts of interest with Cheek, and at that time Cheek did not state that Harris's service was pursuant to his request. (Watts Dep. at 67.) Also, Watts had no knowledge that the Howard Board ever requested that Harris serve on the UNB's Board to safeguard the University's interest, nor did he ever see any evidence in that regard. (Watts Dep. at 17, 36.)

Carlton Alexis was Howard's Vice President for Health Affairs from 1969–87, and became interim President of Howard after Cheek's resignation. He attended over 100 meetings of the Howard cabinet and had no knowledge of the trustees requesting that Harris serve on the UNB Board, (Alexis Dep. at 35), or of Harris ever saying that he had been requested to serve by the University, (*id.* at 11, 35), or of Cheek making such a request, (*id.* at 9.)

Defendant also points to the testimony of Dr. Woods as supporting its characterization of Harris's service rather than Harris's. Defendant notes that Woods was never told by Cheek that he had requested that Harris serve on the UNB Board, (Woods Dep. at 21–22), nor was she ever aware of the Board being told that Cheek has requested that Harris serve, (Woods Dep. at 69.) Woods does not recall the Board's consideration of the issue in 1975, but she did state that she would have expected Cheek to inform the Board if he requested that Harris serve in an official capacity. (Woods Dep. at 35–36, 39–40.) Also, Woods believed that any request by Cheek mentioned at the meeting should have been included in the minutes, which were usually very good. (Woods Dep. at 57–58.)

### c. Conclusion

Suffice it to say that, after the extensive trial testimony, depositions, documentary evidence, and analysis of the foregoing contained within the proposed findings of fact and conclusions of law, this question of Harris's service on the UNB Board remains an extremely close one (which itself is of considerable import, because it affects Harris's

claim of a "bad faith denial" of indemnification, *see infra*). The absence of any trustee who could affirmatively state that the Board requested this service, or that he or she ever heard Cheek make any reference to his "request," is damaging to plaintiff's claim. On the other hand, the University was unable to point to one piece of evidence that definitively proves that the service was personal. The court ultimately concludes that, based upon the evidence presented, Harris was serving at the request of the University, in his official capacity as Vice President and Treasurer.

The court reaches this conclusion first and foremost because it found the live testimony of Harris to be both credible and convincing. Harris's contention that he did not wish to serve on the Board at all, and would not have done so but for Cheek's insistence, was compelling. Based on Harris's testimony, the court has no doubt that Cheek requested that Harris serve on the UNB Board in 1975, despite the absence of a writing.

Second, the court finds the testimony of Dr. Woods, who was chair of the Board during the relevant period, to be of great import. As stated above, she testified that Harris told her that he was serving on the UNB Board as a "representative" of the University and thought that his service was a good idea. Dr. Collins shared this understanding. Officers Nichols, Estep, and Anderson, who were members of the Board during the relevant time, were of the same view. There appears to have been enough of a general feeling that Caspa Harris was at UNB to safeguard the University interest that his service should be considered "official."

Finally, to whatever extent the Board members were uncertain of the nature of Harris's service at the time they approved his service on the UNB Board, that uncertainty should be resolved in favor of Harris. Having received the benefits of a University presence on the UNB Board, it would be unfair to seize upon the passage of twenty-three years and faded memories to now disclaim any knowledge that he was serving at the request of the University. The consequences of the Howard University's failure to be explicit as to what it intended in 1975

must be suffered by the University, not by Harris.

The court concludes that, for the period prior to June 1987, Harris was serving on the UNB Board at the request of the University, in his official capacity; therefore, he was a covered person under the indemnification policy.

### 5. The Period After June 30, 1987

■ Howard's next defense against indemnification is that, following his retirement from the University on June 30, 1987, Harris was neither an officer nor a managing agent of the University. Howard further contends that Harris was not requested to serve on the UNB Board after June 30, 1987. He therefore is not entitled to indemnification, in whole or in part, for claims arising from his service on the UNB Board of Directors after June 30, 1987.

In June 1987, when Harris retired from Howard University, he expected that his service as a director of UNB would also come to a close. Harris wrote the President of UNB to notify the bank of his retirement. (Ex. 64.) Both Harris and Cheek testified that, shortly before Harris retired from Howard, Cheek requested that Harris remain on the UNB Board and monitor UNB for the University, because Harris's replacement as Vice President, Melvin Jones, needed some time to acclimate himself to his considerable duties at Howard. (Harris Direct; Cheek Direct.)[4] As with Cheek's initial "request," and the renewed request in 1975, there is no writing memorializing this. (Stip 70.) Whether or not Harris was to continue to serve was never specially brought to the attention of the Howard Board of Trustees.

The court need not determine whether Cheek requested that Harris continue in his role as a UNB director after Harris's retirement from UNB. Even presuming that Cheek did make this request, Harris is precluded from receiving indemnification because, from the date of his retirement, he was no longer a covered person.

Under the Howard University Bylaws, indemnification is available only to "any Trustee, President, General Counsel ... other managing agents, or members of committees acting consequent to University duties or members of the Security Force." (Ex. 315 at 21.) Clearly, after Harris's resignation from the University in June of 1987, the only possible route to obtain indemnification was as a "managing agent."

The term "managing agent" is not defined in the Bylaws, nor does it appear to have been expressly defined in this jurisdiction. Plaintiff claims that a "managing agent" is "any person, whether a University employee or not, who exercises management responsibilities in the performance of duties within the scope of his agency." However, plaintiff cites no legal· authority for this definition.

Much of the case law construing the term "managing agent" construes the term as it appears in Federal Rules of Civil Procedure 4(h) (Service Upon Corporations and Associations) and 30(b)(6) (regarding deposition of an organization). While the consideration as to whether a person is a "managing agent" for purposes of service of process or depositions may diverge to some degree from director's and officer's indemnification considerations, the court does wish to point out that if Howard University had been sued at any time between June 1987 and 1990, and a plaintiff had served Harris, there is no doubt that the University would have come to court claiming that service was improper.

*Black's Law Dictionary* defines a "managing agent" as:

A person who is invested with general power, involving the exercise of judgment and discretion, as distinguished from an ordinary agent or employee, who acts in an inferior capacity, and under the direction and control of superior authority, both in regard to the extent of the work and the manner of executing the same.

*Black's Law Dictionary* 59 (5th ed.1979); *cf. Leo v. General Electric,* 111 F.R.D. 407, 411 (E.D.N.Y.) (applying this definition in the

---

**4.** In his deposition, Jones testified that no one at Howard ever approached him about serving on the UNB Board, and that when he ultimately did join, he did so out of his own interest in serving on a Bank Board. (Jones Dep. at 14–20.)

service of process area). Another definition of the term comes from California law, which directs a court to look to "the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy." *Egan v. Mutual of Omaha Insurance Co.*, 24 Cal.3d 809, 822–23, 169 Cal.Rptr. 691, 620 P.2d 141 (1979), *quoted in Glovatorium v. NCR Corp.*, 684 F.2d 658, 661 (9th Cir.1982); *see also In re Standard Stores, Inc.*, 124 B.R. 318, 323 (C.D.Cal.1991) (concluding that the term "managing agent" in a congressional statute refers to entities that exert or could exert operational control).

Using either of these definitions, there is no question that Harris was not a managing agent of Howard University after June 30, 1987. Upon his resignation from the University, Harris had no general power over the affairs of Howard University. Nor did he have substantial, if any, discretion to make decisions that would be binding or affect "corporate policy." Harris himself concedes that he was not given any authority to take action on behalf of Howard University, as he testified that he was only authorized to monitor events at UNB and report back to Cheek. (Harris Direct; Cheek Direct.) Even if Harris's role after June 30, 1987 rises to the level of an agency relationship, which by itself is a suspect proposition, his role as an agent does not rise to the level of managing agent.[5] The word "managing" is not surplusage.

Because Harris was neither an officer nor a managing agent of the University after June 30, 1987, he is not eligible for indemnification for the settlement or defense of any claims or threatened claims arising from events occurring after June 30, 1987, including fourteen of the eighteen loan participation claims subject to the $80,000 settlement, nor for the costs incurred in responding to the 1993 OCC investigation.

## B. The Claims for Indemnity

### 1. Does Gross Negligence Preclude Indemnification?

The University Bylaws only permit indemnification "to the extent permitted by law."

(Ex. 315 at 21.) The University claims that indemnification for the gross negligence of a bank director is not permitted by law. Additionally, under the Bylaws, indemnification and defense costs are only available if the person seeking indemnity "acted in good faith for a purpose which such person reasonably believed to be in the best interest" of Howard University. Howard claims that grossly negligent acts cannot satisfy this provision.

### a. Is Indemnification for Gross Negligence Permitted by Law?

█ No cases in the District of Columbia appear to have directly spoken on the University's first defense: namely, that a contract that would indemnify a bank director for his or her gross negligence is void as a matter of public policy, and therefore not permitted by law.

In *National Railroad Passenger v. Consolidated Rail*, 698 F.Supp. 951, 972 (D.D.C. 1988), *vacated on other grounds*, 892 F.2d 1066 (D.C.Cir.1990), Judge Oliver Gasch held that an indemnification provision that would have indemnified a railroad company was not enforceable "in cases of *gross negligence*, reckless, wanton or willful misconduct, or conduct for which punitive damages may be sought." *Cf. Caldwell v. Enyeart*, 72 F.3d 129 (6th Cir.1995) (unpublished table opinion), *available in* 1995 WL 807110 (noting that, under Michigan Law, although a party may contract against harm caused by his negligence, he may not do so with respect to gross negligence). Judge Gasch noted the "very strong public policy consideration" as he held that to permit indemnification in those circumstances "would deprive the traveling public of its reasonable expectation that indemnitee ... would conform its conduct to the safety requirements of the contract." *National R.R. Passenger*, 698 F.Supp. at 972.

The court finds a sufficient similarity between the concerns underlying *National*

see either (a) how that contract *obligated* him to serve on the UNB Board or (b) how the contract makes him a managing agent of Howard.

*Railroad* and the instant case so as to conclude that permitting a bank director indemnification for grossly negligent, reckless, willful, or wanton behavior violates public policy. The banking public places a great deal of trust in the directors and officers of a bank, by entrusting their deposits to the care of another. Directors of a bank therefore have a special duty to make sure that the bank in their charge is following sound banking principles. To permit indemnification for gross negligence would substantially reduce a director's incentive to carefully and prudently execute his or her responsibilities, because the director would know that even if a bank failure could be attributed to his or her grossly negligent, willful, wanton, or reckless conduct, a golden parachute—indemnity—would be there.[6] *Cf. Atherton v. FDIC,* 519 U.S. 213, 117 S.Ct. 666, 674, 136 L.Ed.2d 656 (1997) (noting that a national bank director may be liable for "gross negligence"); *Washington Bancorporation v. Said,* 812 F.Supp. 1256, 1265–66 (D.D.C.1993) (holding that "in some circumstances, bank directors may be held to the heightened duty of care" required by a "simple negligence standard").

Therefore, the court concludes that Howard University is not required to indemnify Harris for actions that are grossly negligent, because to do so would be contrary to law. To hold otherwise would deprive the banking public of its reasonable expectation that bank directors exercise the proper standard of care.

b. Good Faith and the Best Interest of the Corporation

■ The University Bylaws preclude indemnification when an officer or director does not act in "good faith for a purpose which such person reasonably believed to be in the best interest of this corporation." (Ex. 315 at 21.) Under District of Columbia law, the indemnity provision of a contract should not be construed to permit the indemnitee to recover for his or her own negligence unless the Court is *firmly convinced* that such in-

terpretation reflects the intention of the parties. *See W.M. Schlosser Co. v. Maryland Drywall, Co.,* 673 A.2d 647, 653 (D.C.1996). "In order to find that a party contracted away its own liability by receiving full indemnity therefor, there must be a clear intention to do so that is apparent from the face of the contract." *Rivers & Bryan,* 628 A.2d at 637 (citing *District of Columbia v. Royal,* 465 A.2d 367, 368–69 (D.C.App.1983)); *see also United States v. Seckinger,* 397 U.S. 203, 211, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970) ("[A] contractual provision should not be construed to permit an indemnitee to recover for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties.").

■ In the Howard University indemnification provision, there is no clear intent to indemnify for gross negligence. If anything, the intent of the contract provides to the contrary: a potential indemnitee is required to act in "good faith," in a manner that he "reasonably believed" to in the "best interest" of the University, a requirement that is clearly at odds with indemnification for gross negligence or an extreme departure from the standard of care. Notably, even if this court were to adjudge the contract to be ambiguous on this point, indemnification would then be a question for the court in its fact-finding capacity. *See Rivers & Bryan,* 628 A.2d at 635. On the evidence presented, the court would find no intent to indemnify for acts of gross negligence. Therefore, Howard University need not indemnify Harris for those acts for which Harris is adjudged to be grossly negligent in the execution of his duties as a bank director, because his conduct would not meet the standard of conduct set forth in the Bylaws; namely, he would not have acted in good faith in a manner he reasonably believed to be in the best interest of Howard University.

The court will now consider those matters for which the FDIC has asserted (or threatened to assert) claims,[7] to determine if Har-

---

6. Of course, this needs to be balanced against the need for talented people to assume directors' roles, and, therefore, directors found merely negligent presumably would be entitled to receive

indemnification. *See Washington Bancorporation,* 812 F.Supp. at 1268.

7. At trial, defendant was permitted to present evidence attempting to prove defendant's gross

ris was grossly negligent, defined as " 'an extreme departure from the ordinary standard of care.' " *Wager v. Pro*, 603 F.2d 1005, 1010 (D.C.Cir.1979).

## 2. Burden of Proof

 Much of this case turns on who has the burden of proof with respect to gross negligence. Normally, in an indemnification action, the burden falls upon the indemnitee to prove all elements of his claim. *See, e.g., Rivers & Bryan, Inc.*, 628 A.2d at 637 (holding that in an indemnification case, the burden of proof falls upon the indemnitee). However, this case presents a slightly different posture, as the defendant has raised a contractual defense—the gross negligence of the indemnitee. The burden of proving this defense falls upon the party asserting it: Howard University. *See Burlington Northern Inc. v. Hughes Bros., Inc.*, 671 F.2d 279, 285 (8th Cir.1982); *cf. Washington Bancorporation*, 812 F.Supp. at 1268 (noting that courts presume that directors act in good faith until a challenger produces evidence to the contrary).

## 3. The APA Leasing Claims

### a. Factual Background

This background discussion is taken largely from the joint stipulations. The APA Leasing Program began in 1985, when UNB entered into a Dealer Agreement with APA Leasing and Sales, Inc. (APA Leasing), under which APA Leasing referred automobile purchasers to UNB for financing. In early summer 1986, Bradford Waples, an internal auditor for UNB, undertook an audit of UNB's Loan Department. Waples completed his audit report in either August or September 1986. The report revealed serious irregularities in the APA loan portfolio, including (1) continuous overdrafts of APA's operating account with UNB, (2) questionable collateral on transactions, (3) customer complaints of failure to deliver automobiles

after financing, and (4) substantial exposure on loans to the principal owners of APA.

A July 8, 1986 Audit Department Report to UNB's Audit Committee for May and June 1986 reported that an audit of the UNB Loan Department as of May 31, 1986 had begun in June and would continue through the next month. At the September 10, 1986 Audit Department meeting, which Harris attended and chaired, Wallicia Spady reported that an audit of the UNB Loan Department was started as of July 31, 1986. On August 13, 1986, Harris told the UNB Board of Directors that the audit of the UNB Loan Department was in progress.

On September 10, 1986, UNB's Board of Directors held a meeting during which Harris reported:

> The audit of the Loan Department revealed no major exceptions, however, the detailed reports were not submitted during today's meeting. The committee will review the full report at the October meeting.

In September 1986, federal bank examiners issued an examination report of UNB as of June 30, 1986 that criticized UNB's failure to audit the loan portfolio since 1984. Then, at the November 12, 1986 UNB Board meeting where OCC officials discussed the findings of the report of examination, Harris stated that the audit of the Loan Department had been delayed due to the difficulties that the bank had experienced with the ATM Department and a new computer system.

The Audit Department Report for September 1986 was presented at the October 15, 1986 meeting of the UNB Audit Committee. The Report detailed the department's activities in four areas, and also listed as Item V "Loan Department Audit—Installment Loan," but the only available copy of the report contained no information about the Loan Department Audit. According to the minutes of the October 15, 1986 Board meet-

---

negligence outside of the FDIC's asserted or threatened claims, arguing that, whether or not Harris was grossly negligent with regard to the FDIC claims, his overall negligence as a director of UNB would be sufficient to preclude indemnification. The court agrees with plaintiff that he must be found to be grossly negligent with re-

gard to those activities for which the FDIC has asserted (or threatened to assert) claims in order for Howard to deny indemnification. However, the evidence as to Harris's general conduct with respect to his UNB responsibilities is relevant insofar as it proves gross negligence with regard to the asserted claims.

ing, Harris reported on the Department Activities that were detailed in Items I–IV of the Audit Department Report, but made no report on the Loan Department Audit.

During a UNB Board meeting on March 11, 1987 (attended by Harris), UNB's senior lending officer, Blenna Cunningham, reported "an increase in indirect auto loans consistent with previous months." Cunningham reported that this type of loan generally earned higher yields than direct auto loans because they represented the purchase of contracts from auto "dealers." UNB's president stated to the Board that the practice of indirect financing was common in the industry and generally resulted in good and profitable loans.

The minutes of the UNB Board of Directors meeting held April 8, 1987, from which Harris was absent, report that Cunningham informed the Board that installment loan volume continued to increase: that new loans totaled $1,301,000 while pay downs were $393,000, representing a net increase of $908,000 during March, compared to a net increase of $365,000 in February.

The UNB internal audit staff was transferred to JML soon after JML's merger with UNB Bancshares in October 1986. In July 1987, JML began an audit of UNB, during which JML identified numerous irregularities with the APA portfolio. Ultimately, UNB lost in excess of $1.35 million on APA Leasing loans.

b. Is Harris Entitled to Indemnity for Defense Costs Associated with the APA Leasing Losses?

■■■ The touchstone for determining whether Harris was grossly negligent with respect to the APA Leasing Claims concerns Bradford Waples' audit report. Expert witnesses for both the plaintiff and the defendant testified that if Harris saw Bradford Waples' loan audit report documenting the problems with the APA Leasing program, and took no action upon it, he would be grossly negligent, if not reckless, (Greenberg Cross–Exam; Greenberg Dep. at 195–98;

Handorf Exam; Ex. 228 at 20–23), and, therefore, not entitled to indemnification under the Bylaws for the reasons explained previously. Consequently, a substantial portion of the trial was dedicated to determining whether Harris actually received the report in late 1986.

Fortunately, the court need not resolve this question. Even assuming that Harris did not receive the report in September 1986, his failure to obtain it for nine months thereafter constitutes such an extreme departure from the ordinary standard of care that he is not entitled to indemnification.

The undisputed evidence shows that by September 1986, Harris knew that an audit of the loan department had been underway for several months. (Exs.123, 124, 130.) By September 1986 he knew that a preliminary report had been prepared, even if he never actually saw it. (Exs.131, 249.) He also knew that a "full report" was due to be reviewed at the October 15, 1986 UNB Audit committee. (Ex. 131.) Furthermore, his explanation as to his statement in the Board minutes that the report contained no major exceptions—that Ms. Spady told him so—proves beyond any doubt his awareness that the preparation of the report was underway. At trial, he testified that he asked Ms. Spady for the report several times but did not receive it. (Harris Exam; Harris Cross.)

Harris was also reminded of the fact that the loan audit report had not been received because of the unsettling bank examination report reviewed in October 1986, (Ex. 87), which specifically referred to the "internal audit loan review" that had been underway. Also, Harris was aware of the bank examiner's comments at the November 1986 UNB Board meeting, (Ex. 133), that an internal audit review of the loan department was of great import.

So, the question presented is whether Harris's delay of nine months in obtaining the audit report,[8] with full knowledge that it was overdue, constitutes gross negligence such that indemnification is not available.

---

8. In point of fact, calling it a delay of nine months gives more credit to Harris than is merited: he did not actually obtain it at that point— JML did.

Professor Greenberg, plaintiff's expert witness, first testified that, if Harris was told in September or October 1986 that an audit report had been completed, he would have expected him to obtain and review the report within no more than a few months. (Ex. 247 at 207–08.) He noted that his opinion might be "different if we are talking about two months or nine months." (Greenberg Cross.) Confronted by defense counsel with the fact that the actual delay was, in fact, nine months, he then asserted that this delay would not constitute gross negligence. Plaintiff asserts that Greenberg's expert opinion was more informed once he was presented with the extenuating circumstances described below. *See* Plaintiff's Proposed Findings of Facts at 100 n. 63.

Professor Handorf, the University's expert witness,[9] testified that a delay of nine months in obtaining an audit report would constitute gross negligence, especially in light of the aggravating circumstances present in this case. The court agrees with Dr. Handorf's characterization of Harris's conduct, for the following reasons.

First, where audit reports are at issue, Harris was more than just any director. He was on the audit committee. The function of the audit committee included: *"reviewing and examining detailed reports of the internal auditors for UNB;* meeting periodically with internal auditors; reviewing reports of regulatory bodies having jurisdiction over UNB; evaluating internal accounting controls; recommending the engagement and continuation of engagement of independent auditors; and meeting with, and receiving and considering recommendations of, the independent auditors for UNB." (Stip. 36 (emphasis added).) Furthermore, he was not just on the audit committee—he was the *chair* of the committee. The fundamental duty to ensure that audits were regularly conducted, and to follow up when they were not, falls uniquely on him. Professor Handorf noted that, as chair of the audit committee, Harris should have been "badgering" the internal auditor and should have "called her to the carpet" for not providing the report. As noted by Professor Handorf, a bank audit committee's review of audit reports is a fundamental duty, a fact reflected in the UNB Audit Committee's list of duties, (Ex. 97; Ex. 121 at 31), and the OCC *Director's Book,* (Ex. 118 at 13.) Internal audits are normally done every year, also a fact reflected in UNB's policy. (Ex. 87 at 9.)

Second, in light of the fact that the 1985 audit was missed (even if for legitimate cause), it was more important than usual to follow up on the status of the 1986 audit. Dr. Handorf testified that the gap between audits could have been a long enough period of time to fail the bank. (Handorf Exam.) The rapid loan growth during that period should have made Harris as a director all the more concerned about the credit risk exposure. (Ex. 228 at 20.) Furthermore, the bank regulators had warned that the loan department at UNB was understaffed and insufficient, and that internal control weaknesses existed. (Ex. 89 at 9, 10; Ex. 228 at 21.)

Finally, the court must note the minutes of the 1986 Audit Committee and full Board meetings, at which time Harris said that the preliminary report of the loan department audit "was reviewed," (Ex. 249), and "revealed no major exceptions." While these statements were discussed by the parties

---

**9.** The court has absolutely no doubt that Professor Handorf qualifies as an expert witness based upon his skill, experience training, and education. *See* Fed.R.Evid. 702. He holds a Ph.D. in Financial Administration, teaches finance at a major university, has been a special consultant to a leading auditing firm on banking matters, has worked as a consultant for the FDIC, and has published on accounting management at banks. (Ex. 229; Handorf Exam; Ex. 228 at 1.) Plaintiff's counsel spent considerable time at trial questioning Professor Handorf as to whether he understood the nuances between "negligence," "gross negligence," "recklessness," and the like.

Whether or not Harris was acting in a negligent as opposed to a grossly negligent manner is a question of law that this court is being called upon to decide; Pr. Handorf's testimony, as with the testimony of Dr. Greenberg, is admissible to assist the trier of fact to understand the evidence and determine facts in issue. While the opinion of an expert "is not *objectionable* because it embraces an ultimate issue to be decided by the trier of fact," Fed.R.Evid. 704, it would turn the rules of expert testimony on their head to disqualify all experts when they cannot testify as to the ultimate issue.

mainly with regard to the question of whether Harris saw the Installment Loan Audit Report in September 1986, the court finds them to be significant with respect to his gross negligence in not obtaining the report thereafter. Whatever may have motivated Harris to make these assertions, it is the case that they would have caused *all other directors seeing that statement to presume* that the audit had been conducted. Only one director, therefore, could have possibly been on notice that the report had not yet been produced—Caspa Harris. Therefore, no one other than him would have known to "badger" Ms. Spady about the report—making the responsibility uniquely his.

Harris points to "extenuating circumstances" as to why he did not seek to obtain the audit report for nine months after the date upon which it should have been presented. None of these extenuating circumstances, either individually or taken together, leads this court to conclude that Harris was not grossly negligent. In fact, some of them are, in this court's eyes, aggravating circumstances that make his conduct border upon recklessness.

First, Harris contends that Ms. Spady told him that the report contained no serious exceptions, and that Harris's prior experience with Spady caused him to believe her. (Harris Direct.) However, receipt of an oral assurance from management that "all is well" hardly absolves the chair of the bank's Audit Committee of his responsibility to promptly obtain the audit report. The director has an independent duty to verify the staff's conclusion and to "make sure management makes it happen." (Handorf Cross–Exam.) (Of course, this "extenuating circumstance" constitutes a virtual concession that Harris knew that the report had been prepared and completed.) When one's primary responsibility is to serve as a check on management, blind reliance on the assertions of that management cannot mitigate one's responsibility. *See Washington Bancorporation*, 812 F.Supp. at 1269 (noting that directors must sufficiently inform themselves).

Second, during the fall of 1986, Harris claims that he was receiving reports from other sources that indicated no problems in the installment loan department. (Exs.87, 102, 103.) In relying upon this argument, plaintiff mischaracterizes the contents of these other sources. The OCC examination report stated that the "consumer loan officer [Mr. Roper] was recently fired for inappropriate lending practices." (Ex. 87 at 10.) The report also cited "serious internal control weaknesses" in the loan portfolio generally. (Ex. 87 at 1, 6.) It also warned of the rapid loan growth since the last examination and internal audit, the failure to add staff, (*id.* at 9–10), and referenced the "recently started internal audit review" after pointing out the two-year gap in internal audits, (*id.* at 9.) Even Mr. Greenberg, plaintiff's expert, agreed that the report was a "yellow flag." (Greenberg Dep.) Furthermore, the Peat Marwick report, issued in November 1986, while noting some improvement, still asserted that further improvements were required and recommended that the bank "take corrective action on the detail list of deficiencies" in its "loan file maintenance and review procedures." (Ex. 103 at II–3.) These reports should have heightened Harris's vigilance, not reduced it.

Third, Harris notes that the JML/UNB merger closed in late October, which took up substantial time. The court does agree that responsibilities relating to the merger *could* constitute an extenuating circumstance if the report had been received in late October or early November. The merger does not explain why the delay persisted until July 1987. Furthermore, the existence of the merger, if anything, should have heightened the need to complete the audit, so that all parties to the merger would have all relevant information documenting the financial condition of UNB at the time of the merger.

Finally, Harris notes that, after the merger, UNB's internal audit function was transferred to JML. However, he remained on the UNB Audit committee, as chair, and therefore still had an obligation to ensure that the new audits were being considered and handled by JML.

For the aforementioned reasons, the court concludes that Harris was grossly negligent in not taking adequate action to obtain the loan department audit report for nine months

when (1) the existence of internal control weaknesses had been identified, (2) there was rapid loan growth, (3) the nature of the loan growth was unknown to Harris, (4) the loan area was understaffed, (5) bank regulators had stressed the need for an internal audit of the loan department after a two year gap, and (6) bank examiners had prepared a critical report of the overall management of the bank. Harris failed to meet the Bylaws' standard-of-care requirements, because in failing to obtain the report he did not act in good faith for a purpose that he could have reasonably believed to be in the best interest of Howard University. He is therefore not entitled to obtain payment from the University for any defense costs incurred in defending the FDIC's APA Leasing claims.

In addition, Harris's claim in Count III of the Amended Complaint for declaratory relief must be dismissed. Harris is not entitled to a future defense of possible APA Leasing claims, pursuant to the University Bylaws, because he did not satisfy the Bylaws' standard-of-care requirement. As this court noted previously, the University's duty to defend is coextensive with its duty to indemnify. *See* Order of Aug. 12, 1994, at 7 n. 6.

### 4. The Loan Participation Claims

In April 1994, the FDIC threatened claims against Harris in connection with eighteen loan participations that UNB purchased from Madison National Bank between September 1986 and February 1990. The unpaid principal on these loans totaled $9.2 million, plus accrued interest of $1.6 million, for a total of $10.8 million. Because Harris does not qualify for indemnification for any loan participations entered into after his resignation from Howard in June 1987, *see supra* Part II.A.5, the court's analysis is limited to the loans made between September 1986 and April 1987.

At the outset, it cannot go unnoted that Harris was a member of the UNB Loan Committee. That Committee was responsible for reviewing loan requests presented by management, and was specifically required to approve all loan participation purchases. (Stip. 35; Ex. 121 at 31; Ex. 328 at 3.18; Ex.

245 at 266.) The Loan Committee's function was stated as follows:

> The Loan Committee ensures that the bank's lending policies are adequate and the lending activities are conducted in accordance with bank policy and with applicable laws and regulations. The committee monitors loan portfolio quality. It ensures that management follows adequate procedures to identify problems early and take appropriate actions, and maintain an adequate reserve for loan and lease losses to cover estimated actions.

(Ex. 97.) Therefore, Harris's contention that he "was just a director, [and] not an employee of the bank," (Ex. 245 at II:14), is not entirely accurate, as he was not merely any director, but rather a director who had specific responsibilities concerning the loan portfolio greater than directors who did not serve on the Loan Committee.

#### a. Background

In order to determine whether Harris was grossly negligent on the four loans for which he might be eligible for indemnification, the court must first look to the condition of UNB at the relevant time, something of which Harris should have been aware in deciding to approve the loans.

The 1984 OCC examination report noted that senior loan officer Blenna Cunningham had "no previous commercial lending experience," and that the loan department did "not have the capability to underwrite complex commercial credits." (Ex. 86 at 8.) The report cautioned against expanding the loan portfolio without "additional, capable personnel." (*Id.*) UNB was also warned that it needed to develop a loan policy that addressed loan participations.

The 1986 OCC examination report concluded that the "bank's overall condition [wa]s satisfactory," but that the bank was in a "generally unstable condition." (Ex. 87, Letter at 1–2.) Significantly, the cover letter highlighted concerns about loan participation purchases: "noncompliance with Banking Circular # 181 is apparent regarding the lack of credit analysis and documentation on participations purchased." (Ex. 87, Letter at 2.)

The report went on to specifically caution UNB's Board about loan participations purchased from MNB:

> One negative aspect of the association with JML identified at the examination is the purchasing of loan participations from Madison National Bank ... without adequate documentation to comply with the requirements of Banking Circular 181.

(Ex. 87 at 6.)

> Another area of documentation exceptions identified was noncompliance with Banking Circular 181 pertaining to documentation requirements on participation loan purchased. Prudence requires that prior to purchasing participation loans, the bank obtain full credit information necessary to make an informed and independent credit analysis. Likewise, current credit information should be obtained over the life of the credit to properly maintain the loan's status. Several participations purchased were lacking adequate credit information, including current financial statements, collateral status and adequate detail on loan purposes. Also, file documentation did not clearly demonstrate that an independent credit analysis was conducted by management prior to purchasing participation loans. The absence of such documentation may constitute an unsafe and unsound banking practice. Also, *the Directorate should not succumb to the pressure from selling banks, particularly their future affiliate, Madison National Bank, to book loans that they would not make directly.*

(Ex. 187 at 8.) The report also found "[l]ess than adequate supervision on the part of the Board." (*Id.* at 4.)

This report was, even according to *plaintiff's* expert, a "yellow flag." (Greenberg Cross.) Therefore, in deciding whether or not to approve loan participations from MNB, Harris clearly was (or at least should have been) well aware that the bank had been soundly critiqued on these loans in the past. He consequently should have been even more deliberate and careful in performing his director's duties than he would have been on a loan originated by UNB. *Cf. FDIC v. Bierman,* 2 F.3d 1424, 1433 (7th Cir.1993) (noting that bank directors have "a height-

ened responsibility" when they "have an inkling of trouble brewing"). The court will now consider the four participations at issue.

i. McLean–Reston

▮▮▮ This was a $600,000 participation in a $5.3 million loan for the construction of an office building in Reston, Virginia. The loan participation purchase was approved by Harris and the UNB Loan Committee in a telephone poll on September 3, 1986. (Ex. 160.) This purchase equaled about eight percent of the bank's total assets and exceeded twelve percent of the bank's equity measured as of December 31, 1985. (Ex. 107.)

Defendant's expert, Dr. Handorf, looked to the following factors indicating that this was a high-risk, speculative loan, the approval of which constituted gross negligence by Harris:

1. As of September 3, 1986, the 1986 OCC examination report had not been presented to the full UNB Board. However, the most recent examination report, from 1984, had cautioned that the UNB loan department did not have the capacity to underwrite complex commercial loans, and that Blenna Cunningham had no previous commercial lending experience.

2. There was no permanent first mortgage take-out, making it "undesirable" under the UNB loan policy. (Ex. 114–15; Ex. 160.) At trial, Harris testified that *he would not have approved this loan if he knew it was undesirable under the UNB loan policy,* (Ex. 145 at II:123), but later retracted that statement, (Harris Cross). However, in approving this loan, the committee did ignore its own written loan policy.

3. No tenants had been lined up for the office building. Given that this was a construction loan, one would expect to see some preleasing.

4. No appraisal was presented to the UNB Loan Committee. The committee's approval was "subject to" receipt of an appraisal exceeding the amount that would satisfy an eighty percent loan-to-value ratio.

5. The office building was being constructed outside of the primary lending area of Washington, D.C., which accentuated the need for an independent appraisal.

6. The loan was structured with a large interest reserve exceeding $1 million, with an option to renew for three years on an interest-only basis.

7. No financial statements were furnished for any of the guarantors.

8. There was no indication as to what controls, if any, would be imposed on construction draws.

9. Bank examiners had warned UNB about the dangers of purchasing loan participations from MNB, and all directors had read (or should have read) that report. (Collins Dep. 158–60.)

10. In September 1986, UNB was still new to purchasing loan participations through MNB, and UNB had not developed any strategy or policy of doing so.

Professor Handorf concluded that, with this accumulation of factors and others outlined in his expert report, it was irresponsible and reckless for Harris to approve this large loan in a telephone poll. Dr. Handorf claimed that the loan should have been tabled and studied more carefully. (Ex. 228 at 8–10.)

Harris claims that he was not grossly negligent with respect to McLean–Reston, contending that the overall structure of the McLean–Reston loan was typical for commercial construction loans during this time period and complied with UNB's General and Commercial Loan policy. He contends the following:

1. Blenna Cunningham, UNB's senior loan officer, was competent and experienced in making commercial loans.

2. That in September 1986 Harris had no reason to believe that UNB's Loan Department was not capable of underwriting complex commercial loan participations like McLean–Reston, and that the OCC had indicated that the bank's overall condition was satisfactory and contained no criticisms of the underwriting of loan participations.

3. The UNB Loan Department had performed a credit analysis, including an analysis of the financial statement of the six guarantors. The aggregate net worth of the guarantors exceeded $12 million, and their liquid assets available for repayment exceeded $5 million. (Ex. 66 at 4.)

4. The loan was approved subject to obtaining a minimum appraisal sufficient to support an eighty percent loan-to-value ratio, and UNB's Loan & Discount Committee was authorized to approve loans with a loan-to-value ratio in excess of sixty-five percent. (Ex. 119 at 731–32.)

5. The $1 million interest reserve was a typical loan feature during this period for a construction loan that would not produce cash flow until the completed building was leased. (Greenberg Direct.)

6. The lead bank had articulated a convincing rationale for the borrower's option to extend for three years, i.e. to allow for more complete leasing of the building to enhance the borrower's ability to obtain a permanent takeout loan.

7. It was noted in the credit summary that the loan was classified as "undesirable" under UNB's loan policy because it lacked permanent takeout financing. However, the loan policy allowed UNB's executive committee to make exceptions as long as they were clearly noted, which it was.

Based on the above, plaintiff's expert concluded that this loan was not reckless or an extreme departure from ordinary loan underwriting standards—indeed, plaintiff argues that it was probably not even negligent.

As between the analyses provided by the two experts of the McLean–Reston loan, the court found Dr. Handorf's assessment to be far more credible. The court concludes that, based upon the evidence offered by the parties, Harris was grossly negligent in approving the McLean–Reston loan, and that the approval was not made in good faith for a purpose that Harris could have reasonably

believed was in the best interest of Howard University. Though no one of the factors cited above (or the other factors in Dr. Handorf's report) by itself would constitute gross negligence (though the lack of an independent appraisal comes extremely close), the elements taken together compel the conclusion that Harris was grossly negligent. As this court has noted previously, bank directors may be held liable if they fail to "thoroughly investigate" a large loan to a new customer in "an area with which the bank is unfamiliar." *Washington Bancorporation*, 812 F.Supp. at 1266. Harris is therefore not entitled to indemnification for any settlement amounts or associated defense costs attributable to McLean–Reston.

ii. Burke, Cipriano, and Washington Fish Exchange

■ The remaining three loans were approved at a UNB Loan Committee and Board meeting held on April 8, 1987. Harris was absent from that meeting. It is difficult to determine whether this absence should be characterized as an aberration from his exemplary attendance prior to this meeting, or the start of his deplorable attendance record thereafter. (Exs.170, 187.) Because Harris's attendance problems appear to exactly coincide with his resignation from Howard, and these loans were approved before June 30, 1987, the court will give Harris the benefit of the doubt on this point. However, while his absence will not be considered an aggravating factor, it does not absolve him of the consequences of Board approval of that loan; bank directors may be held responsible for actions taken at meetings they do not attend. (Ex. 118 at 49–50.)

The Burke Associates and Cipriano Associates loans were three-year real estate development loans secured by a first trust in the property acquired. The loans were guaranteed by well-known guarantors with combined net worths exceeding $200 million. (Exs.163, 164.)

Other than pointing to Harris's "pervasive" gross negligence, defendant's primary argument that the loan was grossly negligent was the absence of an independent credit analysis. (Ex. 247.) The court finds that, in light of the warnings in the 1986 OCC Examination Report, the approval of *any* loan participation without an independent credit analysis would rise to the level of simple negligence. However, to constitute gross negligence—an extreme departure from the standard of care—a higher threshold must be met. That threshold has not been met here. Defendant has not demonstrated by a preponderance of the evidence that approval of Burke Associates and Cipriano Square loans constituted gross negligence and were not made in good faith for a purpose that Harris reasonably believed to be in the best interest of Howard University.

■ Finally, the Washington Fish Exchange loan was a working capital revolving line of credit, reviewable annually and secured by the accounts receivable and other assets of the borrower. The loan was guaranteed by Atlantic Holdings, Inc., and by two individual guarantors who provided financial statements showing a personal net worth of $15,481,508.00. (Ex. 165.) Problems with this loan cited by the defendant include: insufficient information when the loan was made in 1987, including stale financial statements; concerns about the adequacy of collateral; failure to maintain current credit information; preferential interest rates of UNB base + 1/2%; and noncompliance with banking circular 181. (Ex. 293 at 20–22.)

Again, while approval of this loan may have been improvident, the court finds that approval by Harris does not rise to the level of gross negligence.

Therefore, because the Burke Associates, Cipriano Square, and Washington Fish Exchange loans were approved while Harris was a vice president, serving at the request of Howard University, and, because he was not grossly negligent with respect to the approval of those loans, he is entitled to indemnification for those claims.

III. TORTIOUS BAD FAITH REFUSAL TO INDEMNIFY

■ Count II of the Amended Complaint asserts a claim of "Tortious Bad Faith Refusal to Indemnify." Harris claims that he is entitled to compensatory and punitive dam-

ages because of defendant's bad faith refusal to indemnify Harris as required under the Bylaws.

First, the very existence of a cause of action for "tortious bad faith refusal to indemnify" is at best suspect. In a case virtually identical to this one, *Pope v. American Airlines,* 1993 WL 243321, 1993 U.S. Dist. LEXIS 8896 (N.D.Ill. June 30, 1993), a former officer of American Airlines served on the board of directors of Republic Bank Houston, Ltd., and alleged that he did so at the request of American Airlines. The FDIC asserted that Pope and others mismanaged the Bank. Claims asserted against Pope by the FDIC were settled, and American subsequently denied indemnification. Pope claimed that the denial of this claim was tortious. The court dismissed the claim, holding that "[d]enial of indemnity, even in bad faith, is a contract claim, not a tort claim." *Id.* 1993 WL 243321 at *6.

Plaintiff cites *Washington v. Group Hospitalization, Inc.,* 585 F.Supp. 517 (D.D.C. 1984), to support its proposition that this cause of action exists. "Many jurisdictions have recognized a cause of action in tort for the bad faith refusal of an insurer to pay." *Id.* 585 F.Supp. at 520. However, a critical aspect of this holding is that it addresses the failure of an *insurer* to pay a claim, not an indemnifier. *See Pope,* 1993 WL 243321, U.S. Dist. LEXIS 8896, at *6 (contrasting the law governing insurers from that governing other indemnifiers). Also, later decisions have largely rejected this holding. *See American Nat'l Red Cross, v. Travelers Indemnity Co.,* 924 F.Supp. 304, 307 n. 5 (D.D.C.1996); *American National Red Cross v. Travelers Indemnity Co.,* 896 F.Supp. 8, 12 n. 4 (D.D.C.1995).

Second, even if *Group Hospitalization* did apply to the instant situation, plaintiff "must to show that defendant did not have a reasonable basis for denying benefits under the policy." *Group Hospitalization,* 585 F.Supp. at 520. Here, Howard had a reasonable basis for denying the claim—they did not believe that he was serving at the request of the University. This position cannot be characterized as unreasonable or not taken in good faith, in light of the fact that after

exhaustive discovery and a two-week trial, determining whether Harris was in fact serving at the request of the University still presented an extremely close question, resolved in plaintiff's favor in large part because of his live trial testimony.

Furthermore, there is ample evidence that the University gave Harris's claim careful consideration. Harris's attorney wrote to the University on April 21, 1994, requesting indemnification. (Stip. 139; Ex. 210.) A law firm was retained to investigate the claim by April 29, 1994. (Ex. 211.) That firm interviewed former trustees, with interviews held on May 9, 11, 13, 17, 23, 24, and 27, and June 2, 3, and 4, 1994. (Stip.140.) The University's counsel also had telephone discussions with Harris's counsel, including discussions on April 29, and May 6, 10, 18 and 23, 1994. (Stip 140.) During its investigation, the University had available the September 1975 Board and Budget Committee minutes which indicated that Harris had been "permitted" to join the UNB Board. The University's Board of Trustees considered Harris's demand for indemnification several times, and responded in a timely fashion on each occasion. These included consideration and responses by the Board in June and September 1994, and responses from counsel in August and October 1995. (Stips. 140, 146, 149; Exs. 218, 221, 224; Ex. 231 at 2.)

There certainly is not the requisite " 'frivolous or unfounded refusal to pay,' " *Group Hospitalization,* 585 F.Supp. at 520, or "fraud, ill will, recklessness, wantonness, oppressiveness, [or] wilful disregard of the plaintiff's right," *State Farm Mut. Auto. Insur. Co. v. Hoang,* 682 A.2d 202, 208–09 (D.C.App.1996), needed to support this claim.

Count II is therefore dismissed.

## IV. COMMON LAW INDEMNITY

Harris claims that he was acting at all times within the scope of his employment and agency, and under common law principles he is entitled to indemnification irrespective of whatever indemnification was provided under the University's Bylaws. The common law remedy of indemnity arises from an express or implied contract giving

the right of complete reimbursement to one party who has been compelled to pay that which should have been paid by another. *See Howard Univ. v. Good Food Serv.*, 608 A.2d 116 (D.C.App.1992).

■ In this matter, the University has no common law duty to indemnify Harris. "[F]ar from imposing an expansive duty on employers [to provide indemnity], the common law generally holds agents responsible for their own wrongs; the oft-repeated rule is that a principal is ordinarily not obliged to indemnify an agent for the agent's own tortious conduct." *Gaines v. Walker*, 986 F.2d 1438, 1442 (D.C.Cir.1993). In fact, Harris's claim for common law indemnification is almost identical to that which the court rejected in *Gaines;* namely, that as long as the costs were connected with official duties, the common law requires indemnification.

Harris's only route to common law indemnification would be if he could demonstrate that Howard ordered him to take the actions challenged by the FDIC: if Howard directed him to approve the Loan Participations, or expressly told him to make no effort to obtain the Installment Loan Audit. *See id.* 986 F.2d at 1442 n. 3 (quoting *Restatement (Second) Agency* § 439(c) (1958)). In the absence of any evidence of "specific direction from a principal," *Gaines*, 986 F.2d at 1443, there is no common law remedy available.

## V. DAMAGES

### A. The $80,000 Settlement

Harris settled the FDIC's eighteen threatened loan participation claims for a total of $80,000. The settlement agreement, (Ex. 203), between Harris and the FDIC "contained no allocation of the settlement among the settled loans," (Stip.151).

■ District of Columbia courts take a strict position in allocating settlements to indemnitors, requiring the party seeking indemnity to show a "requisite *exclusive* link" between the settlement amount and claims within the scope of an indemnity provision. *Rivers & Bryan, Inc. v. HBE Corp.*, 628 A.2d at 637 (emphasis added); *cf. Faria v. M/V Louise V*, 945 F.2d 1142, 1144 (9th Cir.1991) (placing the burden on plaintiff to apportion

between covered and noncovered accidents) (citing *Pizani v. M/V Cotton Blossom*, 669 F.2d 1084 (5th Cir.1982)). Both parties contend that the difficulties in allocating the settlement between the covered claims and the noncovered claims precludes making such an allocation. Not surprisingly, plaintiff claims that prevailing on any claim entitles him to complete relief, while defendant states that plaintiff's failure to provide an "exclusive link" requires a denial of all indemnification.

The court does believe that damages can be reasonably allocated between covered and noncovered claims in this instance. *Cf. H.S. Equities, Inc. v. Hartford Accident & Indem. Co*, 661 F.2d 264, 272 (2d Cir.1981); *PepsiCo, Inc. v. Continental Cas. Co.*, 640 F.Supp. 656, 662 (S.D.N.Y.1986). The court will therefore award plaintiff the *pro rata* portion of the settlement, based on the percentage of the total for which indemnification was required.

The gross amount of UNB Loan Participations on which the FDIC asserted claims against Harris was $9,242,359. The total of the three participations for which indemnification is warranted—Burke, Cipriano, and Washington Fish Exchange—is $638,380. Therefore, 6.9% of the total exposure was covered, and the court will award Harris 6.9% of $80,000, or $5,525.00.

### B. Attorney's Fees from February 1993 Through December 1995

Because the indemnification provision in the University Bylaws includes coverage of defense costs, and because at least some of the claims were subject to indemnification, Harris is entitled to recoup some of these costs.

Harris incurred $3,235.30 in responding to the OCC investigation relating to UNB's tax payments in 1990. (Stip.134.) This amount is not recoverable because, as previously discussed, Harris was not a "managing agent" in 1990, and therefore the matters are outside of the scope of the indemnity obligation of the University.

Another $5,380.74 of the fees can be directly attributed to APA Leasing. Because Harris has been adjudged grossly negligent with respect to the APA Leasing claim, the

University need not indemnify for these expenses, because such indemnification is prohibited under the Bylaws of Howard University.

Harris seeks recovery of $14,735.58 in legal fees that were allocated on his legal bills to Cheek, who was being represented at the time by the same counsel. (Exs. 76, 77; Stip. 153.) The court concludes that the University is not obligated to pay Harris for someone else's legal fees that Harris, for whatever reason,[10] has agreed to pay.

█ Another $1,329.70 of the total relating to preliminary FDIC inquiries is not recoverable. At the time these fees were incurred (prior to April 1994), the FDIC had not "made or threatened" claims, and therefore the fees are not within the scope of the Bylaw's indemnity provision. (Ex. 315, at 21.) Preliminary inquiries do not trigger a right to counsel under an indemnity clause where no actual claim has been made or threatened. *See FDIC v. Mijalis*, 15 F.3d 1314, 1333 (5th Cir.1994) (discussing what constitutes an actual claim).

Finally, $8,448.45 in attorney's fees and expenses were for legal work incurred in connection with efforts to obtain indemnification from the University. (Stip. 153; Ex. 76-77.) The court will defer consideration of these fees at this time, as the parties have agreed to defer consideration of this question pending this court's decision on liability. *See infra.*

Of the $54,595.55 in fees, $21,465 is either attributable directly to the Loan Participation Claims or is unsegregated. The court will award the entire amount to Harris; although some of at $21,465 total may be attributable to APA Leasing, there is enough common ground between the two defenses (such as whether Harris served at the request of the University) such that the result is not inequitable for Howard University.

### C. Attorney's Fees Accrued in This Litigation

The parties entered into a stipulation before trial in open court that the question of entitlement to legal fees in this litigation would be deferred to a subsequent proceeding, once liability had been established. The order issued this date sets a schedule for briefing this attorney's fees issue. However, the parties are directed to address this issue based upon this court's conclusion that neither Howard's decision to initially deny indemnity, nor the dispute over document production, constitutes bad faith on the part of Howard University.

### D. Punitive Damages

█ Punitive damages may be awarded for conduct that is "willful and outrageous, exhibits reckless disregard for the rights of others, or is aggravated by 'evil motive, actual malice, or deliberate violence or oppression.'" *Nakajima v. General Motors Corp.*, 857 F.Supp. 100, 103 (D.D.C.1994). The conduct of Howard University does not even approach this threshold.

Furthermore, this case sounds in contract, not in tort. Punitive damages are therefore unavailable as a matter of law. *See Bedell v. Inver Housing*, 506 A.2d 202, 206 (D.C.App. 1986); *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C.App.1982).

## VI. CONCLUSIONS

1. From September 1975, when Cheek presented the question of Harris's service on the UNB Board to the Howard Board of Trustees, until Harris's retirement from Howard on June 30, 1987, Harris's service on the UNB Board was at the request of the University, in his official capacity as Vice President and Treasurer of the University,

---

10. Plaintiffs apparently reason as follows: When Harris originally attended the April 13, 1994 meeting of former UNB directors to discuss the FDIC claims, Cheek appeared without representation. Harris and Cheek thereafter entered into a joint representation arrangement, for which they were to be jointly and severally liable. Harris routinely paid his fees, but Cheek's remained largely unpaid and a balance of $14,735.58 remained outstanding when the joint representation agreement ended. When it came time for Cheek to appear for his deposition in this action, Harris was confronted with a problem—because of the joint representation, Cheek would have a personal interest in the litigation, and would be subject to impeachment. Therefore, Harris decided to pay off the fees with a note.

and he is therefore eligible for indemnification under the University's Bylaws.

2. Following his retirement from the University on June 30, 1987, Harris was neither an officer nor a managing agent of Howard University, and he therefore is not eligible for indemnification under the University Bylaws for claims asserted against him arising, in whole or in part, from his service on the UNB Board of Directors after June 30, 1987. Harris therefore is not eligible for indemnification under the University Bylaws for settlement or defense costs attributable to the fourteen loan participations approved after June 30, 1987.

3. Harris failed to conduct himself in good faith for a purpose that he could reasonably have believed to be in the best interest of the University, due to his gross negligence in failing to obtain the Installment Loan Audit Report until July 1987, nine months after it was to have been obtained. He is therefore not eligible for indemnification under the University Bylaws for defense costs associated with APA Leasing, nor is he entitled to a declaratory judgement that, with respect to the APA Leasing Claim, the University is obligated to indemnify him for future costs of defense, including reasonable attorney's fees.

4. With respect to the McLean–Reston Loan Participation, the court finds that Harris failed to conduct himself in good faith for a purpose that he could reasonably have believed to be in the best interest of the University, due to his gross negligence in approving the loan. He therefore is not eligible for indemnification under the University Bylaws for settlement or defense costs attributable to that loan.

5. With respect to the Burke Associates, Cipriano Square, and Washington Fish Exchange Loan Participations, the court finds that defendant has failed to prove gross negligence by a preponderance of the evidence. Harris therefore is eligible for indemnification under the University Bylaws for settlement and defense costs attributable to those participations.

6. Harris is not entitled to recover his costs of responding to OCC inquiries or FDIC inquiries prior to April 1994, because the inquiries involve events occurring in 1990, when Harris was neither a managing agent nor an officer of the University.

7. Harris is not entitled to indemnification under common law principles, because the University never directed him to take any specific acts as a UNB director.

8. The University did not act in bad faith or in a tortious fashion in denying indemnification. Nor did the University act in bad faith or in a tortious fashion with respect to plaintiff's discovery requests.

9. Plaintiff is to be awarded $ 5,525.00 in damages, and $21,465 in attorney's fees.

A separate order and judgment shall issue this date.

## ORDER AND JUDGMENT

For the reasons set forth in the memorandum opinion issued this date, it is hereby:

ORDERED that judgment be ENTERED for the plaintiff against the defendant in the amount of $26,990.00; and it is further

ORDERED that counsel for the parties shall conduct a post-judgment conference pursuant to Local Rule 215 to discuss issues of attorney's fees; and it is further

ORDERED that parties shall have until sixty (60) days after the date of this order in which to file motions under Federal Rule of Civil Procedure 54(d)(2)(B); and it is further

ORDERED that the parties shall report to the Court on the results of counsel's discussions at a status conference to be scheduled by the Clerk sometime after 60 days from the date of this order.

SO ORDERED.