COTTER CORPORATION,
Plaintiff–Appellant,

v.

AMERICAN EMPIRE SURPLUS LINES
INSURANCE COMPANY, Great American Insurance Company, American National Fire Insurance Company, American Employers' Insurance Company, Lexington Insurance Company, Granite State Insurance Company, and First State Insurance Company, Defendants–Appellees.

No. 01CA1791.

Colorado Court of Appeals,
Div. II.

Aug. 29, 2002.

Certiorari Granted March 3, 2003.

Moye, Giles, O'Keefe, Vermeire & Gorrell, LLP, John L. Watson, Leonard H. MacPhee, Denver, Colorado, for Plaintiff–Appellant.

Faegre & Benson, LLP, Robert L. Matthews, Boulder, Colorado; Lord, Bissell & Brook, A. Kelly Turner, Sarah H. Dearing, Chicago, Illinois, for Defendant–Appellee American Empire Surplus Lines Insurance Company.

McGloin, Davenport, Severson and Snow, Michael M. McGloin, Denver, Colorado, for Defendants–Appellees Great American Insurance Company and American National Fire Insurance Company.

Markusson, Green & Jarvis, P.C., H. Keith Jarvis, Kirstin G. Lindberg, Denver, Colorado, for Defendant–Appellee American Employers' Insurance Company.

Wood, Ris & Hames, P.C., Clayton B. Russell, Denver, Colorado; Sinnott Dito Moura & Puebla, P.C., J. Karren Baker, San Francisco, California, for Defendants–Appellees Lexington Insurance Company and Granite State Insurance Company.

Hogan & Hartson, L.L.P., Charles T. Mitchell, Denver, Colorado, George W. Mayo, Jr., Washington, D.C., for Defendant–Appellee First State Insurance Company.

Powers Phillips, P.C., Joanne M. Zboyan, Denver, Colorado, for Amicus Curiae Complex Insurance Claims Litigation Association.

Opinion by Judge TAUBMAN.

In this declaratory judgment action, plaintiff, Cotter Corporation, appeals various summary judgments entered against it and in favor of defendants, seven insurance companies, on the basis that three different pollution exclusion clauses in their policies excluded coverage for claims brought by subdivision residents who allegedly were harmed by pollution from Cotter's uranium mill. Because we conclude that the policies issued by the seven defendant insurance companies—American Empire Surplus Lines Insurance Company, Great American Insurance Company, American National Fire Insurance Company, American Employers' Insurance Company, Lexington Insurance Company, Granite State Insurance Company, and First State Insurance Company—did not require these insurers to provide coverage or a defense to Cotter, we affirm.

## I. Background

The controversy here concerns Cotter's operation of a uranium mill on a 1.4–square–mile site in Canon City, Colorado, from approximately 1958 until 1986. The site contains an inactive alkaline leach process mill, an old tailings pond disposal area, and a new tailings pond disposal area. Following the construction of the Cotter mill in 1957, the mill operators began extracting a crude uranium oxide known as "yellowcake" from uranium ore. After crushing and processing the uranium oxide, the yellowcake was transported to Illinois for use by Cotter's parent company.

As part of the milling process, a large residue of liquid sludge, called tailings or raffinates, was piped into the tailing ponds. The tailings contained a small amount of residual uranium that had about eighty-five percent of the radioactivity of the original ore. The tailings also contained nonradioactive hazardous materials such as molybdenum, nickel, arsenic, and selenium.

In 1989, 532 residents of Lincoln Park, the Canon City subdivision near the Cotter mill, sued Cotter, its parent corporation, and others in federal district court in Colorado. *Boughton v. Cotter Corp.*, No. 89–2–1505 (D. Colo. filed Sept. 1989). Plaintiffs alleged that material from Cotter's uranium mill had seeped from the tailings ponds into their neighborhood, causing personal injury, property damage, and economic harm.

In 1991, another sixty-seven plaintiffs filed a similar action. *Dodge v. Cotter Corp.*, No. 91–2–1861 (D. Colo. filed Oct. 24, 1991).

Cotter gave timely notice of the *Boughton* and *Dodge* claims to its insurers, the defendants here, all of whom denied coverage and refused to defend or indemnify Cotter, based upon pollution exclusion clauses in their policies.

At issue here are the following policies: a Lexington commercial liability policy, effective August 1987 to August 1988; an American Empire policy, effective August 1995 to August 1996; seven policies issued by Great American and American National, effective June 1975 through August 1986; three American Employers' primary policies, effective June 1971 through June 1974; an American Employers' umbrella policy, effective October 1970 through January 1973; four Lexington excess insurance policies, effective January 1974 to June 1979; a Granite State excess policy, effective June 1982 to June 1983; and a First State excess umbrella policy, effective March 1977 to June 1978.

Following a bellwether trial in the *Boughton* case resulting in a judgment against Cotter for nearly $80,000, Cotter entered into a confidential settlement with the remaining *Boughton* plaintiffs. *See In re Chevron U.S.A., Inc.,* 109 F.3d 1016, 1019–20 (5th Cir.1997)(bellwether trial addresses claims of some members of a large group to enhance the prospects of settlement and to resolve common issues). In *Dodge,* several trials resulted in jury verdicts against Cotter for more than $16 million, and with interest, the judgment exceeded $43 million. Cotter has appealed those judgments to the Tenth Circuit Court of Appeals, and those appeals are pending.

Seeking coverage for its liability in the *Boughton* and *Dodge* cases, Cotter then filed this declaratory judgment action. Between October 1998 and May 2001, the trial court granted summary judgments in favor of the insurers based upon qualified pollution exclusions in their policies. The trial court determined that because Cotter had expected and intended a discharge of pollutants from the tailings ponds during the policy periods, the exception to the qualified pollution exclusions did not require the insurers to provide coverage to Cotter. As relevant here, the trial court also concluded that two excess insurers, American Empire and First State, had no duty to defend Cotter.

The trial court granted Lexington's summary judgment based upon an absolute pollution exclusion, because it was undisputed that Cotter had discharged contaminants into the land and atmosphere.

As discussed in more detail below, the qualified pollution exclusion is so named because it excludes from coverage all pollution-related injuries, but is limited or "qualified" by an exception that restores coverage for "sudden and accidental" events or "sudden, unintended and unexpected happening[s]." In contrast, those policies containing an absolute pollution exclusion do not contain such a limiting provision.

From these summary judgments, Cotter now appeals.

## II. Standard of Review

We review a summary judgment de novo, applying the same standards that govern the trial court's determination. Summary judgment is warranted only when there is a clear showing that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *Churchey v. Adolph Coors Co.,* 759 P.2d 1336 (Colo.1988); *Waskel v. Guar. Nat'l Corp.,* 23 P.3d 1214 (Colo.App. 2000).

The moving party has the initial burden to show that there is no genuine issue of material fact. The burden then shifts to the nonmoving party to establish that there is a triable issue of fact. *AviComm, Inc. v. Colo. Pub. Util. Comm'n,* 955 P.2d 1023 (Colo. 1998).

The nonmoving party is entitled to all favorable inferences that may be drawn from the undisputed facts, and all doubts as to whether a triable issue of fact exists must be resolved against the moving party. *Compass Ins. Co. v. City of Littleton,* 984 P.2d 606 (Colo.1999).

## III. Qualified Pollution Exclusion Clauses

Cotter contends that the trial court improperly interpreted the qualified pollution

exclusion clauses in the policies at issue. It further argues that under the correct interpretation, disputed issues of material fact prevent summary judgment. We disagree.

### A. Contract Interpretation

■ At issue here is the interpretation of the various "sudden and accidental" and "sudden, unintended and unexpected" exceptions to the pollution exclusion clauses.

The pollution exclusion in the policies issued by Great American, Granite State, Lexington, and American Employers' reads as follows:

> This insurance does not apply:
>
> . . .
>
> to bodily injury or property damage arising out of the *discharge, dispersal, release or escape* of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but *this exclusion does not apply if such discharge, dispersal, release, or escape is sudden or accidental.*

(Emphasis added.) American Empire's pollution exclusion clause is identical, but applies only to bodily injury.

In contrast, First State's pollution exclusion clause reads as follows:

> The Insurance does not cover any liability for:
>
> (1) Personal Injury or Bodily Injury or loss of or damage to or loss of use of property directly or indirectly caused by *seepage, pollution, or contamination,* provided always that *this clause shall not apply to* liability for Personal Injury or Bodily Injury or loss of or physical damage to or destruction of tangible property, or loss of use of such property damaged or destroyed, where such seepage, pollution or contamination *is caused by a sudden, unintended and unexpected happening during the period of this insurance.*

(Emphasis added.)

The crux of the dispute here is Cotter's contention that the phrase "unexpected and unintended" refers to whether Cotter expect-

ed or intended to harm the environment offsite from the mill facility. In other words, Cotter argues that it must have expected or intended to harm the environment to trigger the pollution exclusion clause and that any de minimis discharge of contaminants should not be considered a "polluting event." It thus defines "polluting event" as a discharge that is harmful to the environment. In contrast, the insurers argue that what must be "unexpected or unintended" is the discharge, dispersal, release, or escape of contaminants into the environment. We agree with the insurers.

The interpretation of an insurance contract and the determination whether that contract is ambiguous are questions of law that we review de novo. *TerraMatrix, Inc. v. U.S. Fire Ins. Co.,* 939 P.2d 483, 486 (Colo.App. 1997).

We will enforce a policy as written, unless there is an ambiguity in the policy language. *State Farm Mut. Auto. Ins. Co. v. Stein,* 940 P.2d 384, 387 (Colo.1997).

Thus, we may not look beyond the plain words of an insurance contract to interpret it based on the parties' underlying intent unless the contract terms are ambiguous or are used in a special or technical sense not defined in the contract. *TerraMatrix, Inc. v. U.S. Fire Ins. Co., supra.*

A provision is ambiguous when it reasonably is susceptible of more than one meaning. The fact that the parties disagree about the meaning of a contractual provision does not establish ambiguity. *TerraMatrix, Inc. v. U.S. Fire Ins. Co., supra.*

An ambiguous contractual provision must be construed against the drafter and in favor of providing coverage to the insured. *Compass Ins. Co. v. City of Littleton, supra,* 984 P.2d at 613.

At the outset, we note that the supreme court, as well as courts in many other jurisdictions, have interpreted various words and phrases in pollution exclusion clauses similar to those at issue here.

As pertinent to our analysis, the supreme court interpreted a "sudden and accidental" pollution exclusion clause in *Hecla Mining Co. v. New Hampshire Insurance Co.,* 811

P.2d 1083, 1091 (Colo.1991). After a detailed analysis of the exclusion language and decisions from other jurisdictions, the court concluded that the phrase "sudden and accidental" was ambiguous and therefore had to be construed against the insurer to mean "unexpected and unintended." Similarly, in *Public Service Co. v. Wallis & Cos.*, 986 P.2d 924, 930–31 (Colo.1999), the supreme court held that the phrase "sudden, unintended, and unexpected" was ambiguous and must be construed as "unprepared for, unintended, and unexpected."

That same year, in *Compass Insurance Co. v. City of Littleton, supra*, 984 P.2d at 610, the court addressed the phrase "discharge, dispersal, release or escape" to determine whether this language applied to the initial placement of contaminants in a landfill or the subsequent release of hazardous substances from the landfill into surrounding areas and groundwater. Persuaded by the analysis and conclusion of the Washington Supreme Court in *Queen City Farms, Inc. v. Central National Insurance Co.*, 126 Wash.2d 50, 882 P.2d 703 (1994), the court held that the "relevant polluting event" for purposes of the pollution exclusion clause is the *"release of pollutants from a containment area* and not the initial placement of waste in that containment area." *Compass Ins. Co. v. City of Littleton, supra*, 984 P.2d at 617 (emphasis added).

Here, the relevant language of the more common qualified pollution exclusion clause is as follows: "[T]his exclusion does not apply if such discharge, dispersal, release, or escape is sudden or accidental." As we read the plain language of the phrase, the relevant inquiry is whether the discharge, dispersal, release or escape was expected and intended, as opposed to whether the insured expected or intended to harm the environment. *See Compass Ins. Co. v. City of Littleton, supra; Hecla Mining Co. v. New Hampshire Insurance Co., supra*. If the discharge, dispersal, release, or escape was unexpected and unintended, insurance coverage is restored. If not, the exclusion operates to remove coverage.

Similarly, under the First State policy, if seepage, pollution, or contamination is caused by a "sudden, unintended and unexpected happening," then coverage is restored. Otherwise, there is no coverage. *See Pub. Serv. Co. v. Wallis & Cos., supra.*

Contrary to Cotter's contention, the pollution exclusion clauses do not require that the insured expect and intend that the discharge harm the environment. Thus, we disagree that the relevant polluting event is a discharge of contaminants that Cotter expected or intended to harm the environment. Rather, as we read *Compass*, the relevant polluting event is the intended or expected release of contaminants from a containment area.

Our interpretation is supported by the decision in *Queen City*: "We therefore hold that the relevant polluting event is the discharge, dispersal, release, or escape of toxic material into the environment," and "the discharge, dispersal, release, or escape must be sudden and accidental" for coverage to apply. *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co., supra*, 882 P.2d at 719–20. The *Queen City* court further held, "If the polluting event is expected or intended, then coverage is excluded under the qualified pollution exclusion." *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co., supra*, 882 P.2d at 725; *see also Hecla Mining Co. v. New Hampshire Ins. Co., supra*, 811 P.2d at 1088 n. 7 ("the pollution exclusion clause focuses on whether the discharge of pollution was unexpected or unintended").

However, relying on language from *Queen City* and *Textron, Inc. v. Aetna Casualty & Surety Co.*, 754 A.2d 742 (R.I.2000), Cotter argues that the pollution exclusion clause protects a polluter like itself who made good faith efforts using state-of-the-art technology to control pollution, but does not shelter an active or reckless polluter. However, *Queen City* and *Textron* describe polar opposites— the deliberate, reckless, and intentional polluter, for whom no coverage should be afforded, and the polluter who takes great care to arrange for the proper disposal of hazardous wastes, for whom coverage should be provided under the exception to the pollution exclusion clause. Here, in contrast, Cotter may not have intended to harm the environment, but nevertheless intended or expected that

contaminants would be released into the environment.

Cotter further urges us to rely on language in *Queen City, supra,* 882 P.2d at 719, that concerns a polluter who deposited toxic material in a place that it believed would contain or safely filter the material. We conclude that *Queen City* is factually distinguishable, and in any event the *Queen City* court rejected such an argument, as have we: "Because the focus of the exclusion is on the polluting event [the discharge], and not the damages, we conclude the construction offered by [plaintiffs] … is not reasonable insofar as it focuses only on damage resulting from the polluting event." *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co., supra,* 882 P.2d at 724. Thus, we reject Cotter's interpretation of *Queen City.*

Similarly, Cotter relies on *Textron, Inc., supra,* to support its contention that an insured who makes a good faith effort to contain and neutralize waste is not precluded from coverage under a pollution exclusion clause. However, the holding there is limited to the interpretation of the term "sudden and accidental" in the pollution exclusion clause. Thus, the reference to "intentional and reckless polluters" is dictum.

Further, we determine that Cotter's extensive reference to the history of the pollution exclusion clause is unhelpful, because the supreme court has already interpreted the qualified pollution clauses at issue. *See Pub. Serv. Co. v. Wallis & Cos., supra; Hecla Mining Co. v. New Hampshire Ins. Co., supra.*

### B. Issues of Fact

■ Cotter next contends that even under the interpretation of the pollution exclusion clause we adopt here, the insurers failed to meet their burden of establishing that there were no issues of material fact. We disagree.

First, we note that in its opening brief, Cotter states, "Cotter understood some migration of contaminants would occur from its old tailings pond, but it did not expect to pollute." Given our interpretation of the exclusion, we could affirm the trial court's summary judgments on this basis alone. Clearly, if Cotter understood that some contaminants would migrate from the tailings pond, it expected their discharge, dispersal, release, or escape.

Second, in response to a request to admit that by 1974 it had reason to believe that contaminants from the mill had migrated off-site, Cotter also stated, "Cotter admits that the very nature of the uranium milling process contemplates migration of certain contaminants off-site from the mill which is the basis for regulatory monitoring requirements imposed by governmental agencies…."

Third, the summary judgment motion included as an attachment the following testimony of a Cotter expert witness during the *Boughton* trial: "Contamination in Lincoln Park stems from seepage of the old [tailings] ponds. The seepage that existed that went on in the 1960's and 70's was not a function of the geology. It was a function of the fact that ponds were designed to seep, and that's what happened." This testimony clearly describes the antithesis of an unintended discharge, dispersal, release, or escape.

Finally, the insurers presented a series of communications from the Colorado Department of Health between 1968 and 1977 that notified Cotter of visible seepage from its tailings ponds and the contamination of off-site waters, such as Sand Creek. In addition, the insurers presented a report prepared by a hydrology consulting company for Cotter that addressed the seepage of raffinates out of the holdings ponds and the contamination of downstream waters. Also, the insurers submitted a proposed update, dated August 1983, to the national priorities list site under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, et seq. (2001), documenting groundwater contamination from the discharge of radionuclides and heavy metals from the unlined tailings ponds at the Cotter mill site. These exhibits demonstrate that, at a minimum, after the first notice of seepage and contamination in 1968, Cotter expected the discharge dispersal, release, or escape of contaminants from its tailings ponds into the environment.

In response, Cotter submitted exhibits that tended to show it did not intend to pollute or cause harm to the environment. However, Cotter submitted no exhibits to rebut the insurers' exhibits demonstrating that it intended and expected contaminants to leach from the tailings ponds.

Cotter argues that even if some pollutants were discharged from its tailings ponds, it did not intend that the contaminants leach offsite and thus the pollution exclusion clause does not apply. We are not persuaded. Nothing in the plain language of the pollution exclusion clause requires that the discharge, dispersal, release, or escape of contaminants be limited to Cotter's onsite facility.

We therefore conclude that Cotter did not meet its burden of establishing that there were triable issues of fact. Thus, the trial court properly granted the insurers' motions for summary judgment.

## IV. Duty to Defend of Excess Carriers

■ Cotter next contends that the trial court erred in granting summary judgment to American Empire and First State, because genuine issues of material fact exist as to these excess carriers' duty to defend. We disagree.

■ At the outset, we note that Cotter sets forth no material facts in dispute and essentially argues that the trial court erred as a matter of law. Accordingly, we review de novo the trial court's conclusions that neither carrier had a duty to defend Cotter. *See Churchey v. Adolph Coors Co., supra.*

The American Empire policy at issue here was in excess of a primary policy issued by Great American. The First State policy was in excess of a primary policy issued by Great American and a first excess policy issued by Lexington.

Both policies were indemnity policies and expressly disclaimed any duty to defend. American Empire's disclaimer provided in pertinent part: "The Company shall not, however, be called upon to assume charge of the settlement or defense of any claim made, or suits brought, or proceedings instituted against the Insured." The First State policy contains substantially similar language.

In *Bertagnolli v. Ass'n of Trial Lawyers Assurance,* 934 P.2d 916, 918 (Colo.App. 1997), a division of this court interpreted a similar indemnity policy, concluding that "[b]y its plain terms, the policy does not impose on insurer a duty to defend; to the contrary, it specifically states that insurer has no such obligation." The trial court here properly relied on *Bertagnolli* in concluding that the policies in question did not impose upon American Empire or First State a duty to defend Cotter.

Nonetheless, relying on *Allstate Insurance Co. v. Frank B. Hall & Co.,* 770 P.2d 1342 (Colo.App.1989), Cotter argues that this situation is analogous to an "other insurance" clause which shifts some or all of the burden of the loss covered by a policy to other policies that also cover the same risk. *Frank B. Hall* is clearly distinguishable because here, the excess policies covered a risk different from that of the primary policies: They imposed only a duty to indemnify, whereas the primary policies also imposed a duty to defend.

Further, this is not a situation where two primary policies each attempt to be excess of the other, with the result that neither would apply. *Cf. Pub. Serv. Co. v. Wallis & Cos., supra.*

We also reject Cotter's contention that American Empire and First State are independently liable for defense costs under a theory of equitable subrogation. Relying on *Millers' Mutual Insurance Ass'n v. Iowa National Mutual Insurance Co.,* 618 F.Supp. 301 (D.Colo.1985), Cotter maintains that when all obligated insurers have refused to defend, they should share in the cost of defense under equitable principles. *Millers' Mutual* is inapposite, however, because there both insurers' policies expressly provided a duty to defend, but here American Empire and First State had no duty to defend.

In light of our conclusion, we need not address Cotter's contention that issues of fact remain as to whether the primary policies will be exhausted.

## V. Absolute Pollution Exclusion Clause

■ Finally, Cotter contends that the trial court erred in finding that the absolute pollu-

tion exclusion clause in Lexington's policy was clear, unambiguous, and enforceable. Again, we disagree.

The Lexington commercial liability policy for August 1987 to August 1988 contained an absolute exclusion clause as follows:

> "Bodily Injury," "Personal Injury" and/or "Property Damage" (including loss of use thereof) caused by, contributed to or arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalines, toxic chemicals, liquids or gases, waste materials or other irritants, pollutants or contaminants into or upon land, the atmosphere or any course or body of water, whether above or below ground.
>
> It is understood and agreed that the intent and effect of this exclusion is to delete from any and all coverages afforded by this policy any claim, action, judgment, liability, settlement, defense or expense in any way arising out of such discharge, dispersal, release or escape whether such results from the Insured's activities or the activities of others and whether or not such is sudden or gradual, and whether or not such is accidental, intended, foreseeable, expected, fortuitous or inevitable, and wherever such occurs.

According to Cotter, this language renders the pollution exclusion clause so broad as to be meaningless. In a related argument, Cotter asserts that the absolute pollution exclusion clause is ambiguous. We do not agree.

In *TerraMatrix, Inc. v. United States Fire Insurance Co.*, *supra*, a division of this court interpreting a similar absolute pollution exclusion clause recognized that some courts have held such clauses unambiguous under all circumstances, while others have considered whether the clause was ambiguous when applied to the facts and circumstances of a particular case. Adopting the latter approach, the division in *TerraMatrix* held that under the factual circumstances before it, the policy at issue precluded coverage for damages caused by ammonia vapors that were produced as a byproduct of the insured's printer and were not vented properly. As the trial court here concluded, "The *TerraMatrix* court held that the exclusion unambiguously excluded coverage for pollution[-]caused damage and therefore, the insurance company had no duty to defend or indemnify insured for the claim."

Relying on *TerraMatrix*, Cotter maintains that the Lexington policy here is ambiguous because its literal language precluded coverage for virtually all of Cotter's potential liability.

However, while Lexington and Cotter could have negotiated a policy that more precisely identified materials produced by Cotter that Lexington intended to exclude from coverage, they did not do so. There is nothing inherently ambiguous or unclear about the language of the absolute pollution exclusion at issue. There is no dispute that Cotter's activities included the "discharge, dispersal, release or escape" of "irritants, pollutants or contaminants" into or upon land or water. Thus, under the particular facts and circumstances here, the clause unambiguously excluded coverage. As the trial court concluded, "the exclusion clause is clearly intended to be an absolute bar to coverage for any form of pollution."

In so holding, we recognize, as Cotter asserts, that some courts have concluded that any absolute exclusion clause cannot be read literally because such interpretation would negate virtually all coverage. *See, e.g., American States Ins. Co. v. Kiger*, 662 N.E.2d 945 (Ind.1996). Nevertheless, the overwhelming majority of courts addressing the issue have found that the absolute pollution exclusion unambiguously bars coverage for claims arising out of exposure to irritants, pollutants, or contaminants, as is the case here. *See, e.g., Technical Coating Applicators, Inc. v. U.S. Fid. & Guar. Co.*, 157 F.3d 843 (11th Cir.1998); *Alcolac, Inc. v. Cal. Union Ins. Co.*, 716 F.Supp. 1546 (D.Md. 1989); *Truitt Oil & Gas Co. v. Ranger Ins. Co.*, 231 Ga.App. 89, 498 S.E.2d 572 (1998); *Town of Harrison v. Nat'l Union Fire Ins. Co.*, 89 N.Y.2d 308, 653 N.Y.S.2d 75, 675 N.E.2d 829 (1996); *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517 (Tex.1995)(collecting cases).

Further, contrary to Cotter's contention, our interpretation does not nullify the essen-

tial coverage provided by the Lexington policy for a wide variety of accidents or mishaps. *See Technical Coating Applicators, Inc. v. U.S. Fid. & Guar. Co., supra.*

Accordingly, we conclude that the trial court properly determined that the Lexington policy containing the absolute exclusion clause did not afford coverage to Cotter.

The judgment is affirmed.

DAILEY and PIERCE *, JJ., concur.