EnergyNorth v. American Home Assur.   CV-99-502-JD   07/16/03
                  UNITED STATES DISTRICT COURT FOR THE
                        DISTRICT OF NEW HAMPSHIRE


EnergyNorth Natural Gas, Inc.

     v.                              Civil No. 99-502-JD
                                     Opinion No. 2003 DNH 120
American Home Assurance Co., et al.


                              O R D E R


     The plaintiff, EnergyNorth Natural Gas, Inc. ("ENGI"), seeks

a declaratory judgment and alleges breach of contract with

respect to insurance policies issued by the defendants.  In

particular, ENGI contends that the defendants are obligated to

provide a defense and indemnification for ENGI's expenses

incurred in responding to a directive of the New Hampshire

Department of Environmental Services ("NHDES") for identification

and remediation of contamination, which originated at a site in

Dover where ENGI's predecessor in interest operated a

manufactured gas plant.  Defendants, London Market Insurers

("LMI"), joined by Century Indemnity Company and Northern

Assurance Company of America, move for summary judgment on the

grounds that certain provisions in the applicable policies bar

coverage.



                            Background

     A manufactured gas plant operated in Dover from 1850 until

1956.  ENGI's predecessor, Gas Services, Inc. ("GSI"), owned and

operated the plant from 1945 to 1955.  In 1955, GSI transferred the plant to Allied New Hampshire Gas Company, and the plant ceased operations in 1956 when natural gas became available. ENGI no longer owns the plant site.

In addition to the plant in Dover, ENGI, through its predecessors, owned and operated plants at several different locations in New Hampshire, including Concord, Laconia, and Nashua.  As a former owner of the sites, ENGI is obligated to address the contamination and environmental problems caused by plant operations.  The expenses of responding to the contamination and environmental problems have generated years of disputes and legal action between ENGI and its liability insurers in state and federal courts.

ENGI litigated a coverage issue with its liability insurer, Continental Insurance Company, pertaining to the meaning of "accident" in the policies applicable to ENGI's claims originating from the Concord plant site.  EnergyNorth Natural Gas v. Cont'l Ins. Co., 146 N.H. 156, 158 (2001) ("Continental"). Two similar suits involving different manufactured gas plant sites are proceeding in this court.  See, e.g., EnergyNorth Natural Gas, Inc. v. Underwriters at Lloyd's, 97-064-M; EnergyNorth Natural Gas, Inc. v. Utica Mut. Ins. Co., 99-049-M; see also Energy North Natural Gas Inc. v. AEGIS, 95-591-B (D.N.H. June 5, 2002) (dismissing coverage claims for Concord plant site).  A question may be certified to the New Hampshire Supreme

2

Court in EnergyNorth, 97-064-M and 99-049-M to determine what trigger-of-coverage standard should be applied under the applicable insurance policies. This case is stayed with respect to the trigger-of-coverage issue, pending resolution of the issue in that case.

The Dover plant site is located on Portland and Cocheco Streets, just north of the Cocheco River. In its one hundred years of operation, the plant manufactured gas through a coal process, an oil process, and a carbureted water process. During the manufacturing process, gas was held in tanks -- a relief gasholder of 12,000 cubic feet, which held gas before it went to the purifiers, and a gasholder of 130,000 cubic feet, which stored gas before distribution. The gasholder tanks were underground. Tars and oils settled at the bottom of the tanks. Water that was used to seal the gas in the tanks also mixed with oil and tar at the bottom. The manufacturing process occurred in a boiler house which had boilers, fuel tanks, and tar storage.

The gas manufacturing process generated waste and byproducts including tar, oil, used purification products, ash, coal slag, and clinker. Tar produced by the Dover plant was reused as fuel for the boilers and was sold to an outside contractor. Unlike some of the other manufactured gas plant sites in New Hampshire, the Dover site did not have a waste or discharge collection "pond." Because of the plant's location next to the river, some wastes may have been discharged into the river, although there is

3

no direct evidence of such discharges. Purifier box wastes, consisting of wood chips, sulfur, and ferric ferrocyanide, were found buried near the plant site.

The plant's structures have been demolished or buried. Little documentary information is available about the plant and its operations. Only one former employee at the plant, James McAdams, has been located and deposed. McAdams was manager of the plant from 1945 to 1954. He was not aware of any discharges of wastes or byproducts directly into the river. Tar was stored in a tank until it was hauled away by the outside contractor. McAdams remembered that tar sales were important to the plant's business, and he was not aware that the plant produced any tar that it did not sell. McAdams did remember that drip oils were pumped from the distribution system and were dumped near the river.

The majority of the contamination at the Dover site originated from the locations or "footprints" of the two gasholders and the boiler house. Dr. Neil S. Shifrin, ENGI's expert witness, concluded that the Dover plant was designed and operated in a manner that was consistent with the industry in general. Leaks and spills were unintentional and, if known, were cleaned or fixed by the operators. Dr. Shifrin has concluded that the contamination of soil and groundwater at the Dover plant came primarily from inadvertent leaks and spills in and around the two underground gasholders and from inadvertent leaks in the

4

fuel handling equipment in the boiler house.  A typical leak from the gasholders would be underground, from the bottom of the tank. Dr. Shifrin's map of the area indicates that contamination from the plant site has spread and continues to spread into the groundwater at the plant site, into the surface water, and into the river and river sediment.

The NHDES directive, dated April 21, 1999, which is the basis for ENGI's liability arising from the Dover plant site and for its claim for insurance coverage, is appended to the original complaint.  The directive states that "there has been a release of contaminants at the [Dover] site from a former manufactured gas plant operation," and references "the Final Site Inspection Prioritization Report for the Dover Gas Plant property completed by Weston/ARCS on December 9, 1994."  The directive asks ENGI to "participate in the development of a Site Investigation Report (SIR) in accordance with the requirements outlined in Env-Wm 1403."  The parties apparently agree that at present no remediation plan has been developed so that it is not now possible to predict the nature, extent, or cost of any investigation or remediation efforts that may be required.

ENGI claims coverage under excess liability policies issued to GSI by Century Indemnity Company, Lloyd's (Underwriters London), and Northern Assurance Company of America.  ENGI seeks a declaratory judgment under both the federal and state declaratory judgment statutes.  See 28 U.S.C. § 2201; N.H. Rev. Stat. Ann.

5

("RSA") 491:22. ENGI also alleges that the defendants have breached their insurance contracts by failing to provide a defense and indemnification for the costs of ENGI's response to the NHDES directive.

Similar claims pertaining to different manufactured gas plant sites are proceeding in two other cases in this court.

## Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment must present competent evidence of record that shows a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Torres v. E.I. Dupont de Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000). All reasonable inferences and all credibility issues are resolved in favor of the nonmoving party. See id. at 255; Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999).

Because ENGI brought its declaratory judgment claim under RSA 491:22 to determine the coverage of the liability policies in question, that claim is subject to the burden of proof provided by RSA 491:22-a.  EnergyNorth Natural Gas v. Assoc. Elec. & Gas Ins. Servs., Ltd., 21 F. Supp. 2d 89, 95 (D.N.H. 1998).  The insurers, who are the defendants in this action, therefore, bear the burden of proving that the policies do not provide the coverage claimed by ENGI.  RSA 491:22-a; Przekaza v. Gen. Acc. Ins. Co. of Canada, 146 N.H. 40, 42 (2001).  For purposes of summary judgment, the defendants, as the moving parties who will bear the burden of proof at trial, must establish the lack of coverage through undisputed material evidence and "the absence of evidence on a critical issue weighs against [them]."  Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001); see also In re Varrasso, 37 F.3d 760, 763 (1st Cir. 1994).

## Discussion

LMI, joined by the other defendants, contends that the holding in Continental, which addressed the meaning in liability policies of an injury caused by accident, precludes coverage in this case.  They also assert that pollution exclusions and exclusions of coverage for damage to the insured's own property or formerly owned property in the applicable policies preclude

coverage.  ENGI objects to summary judgment and requests oral argument on the motions.[1]

A.  Accident

ENGI's complaint alleges that the defendants' insurance policies cover ENGI's liability for damages and expenses arising from the NHDES directive.  In the amended complaint, ENGI lists the applicable policy numbers and coverage periods but does not include any allegations as to the specific policy language on which it bases its claims.  The parties appear to agree that the policies provide coverage only for damages that are caused by an accident, occurrence, or fortuity.  For purposes of summary judgment, the defendants focus on the meaning of "accident" as construed by the New Hampshire Supreme Court in Continental, 146 N.H. at 158-66.

In Continental, the insurer challenged ENGI's claim to coverage for expenses incurred in investigating and remediating contamination at part of its manufactured gas plant site in Concord.  Id., 146 N.H. at 157-58.  At issue was the Tar Pond, next to the Merrimack River, which contained wastes that had been deliberately discharged from the plant through a sewer pipe

_____

[1]ENGI objects, in footnotes, to the joinders filed by Century and Northern Assurance.  ENGI contends that the joinders are untimely motions for summary judgment.  The court is satisfied that the joinders comply with the requirements of the case management order.

during its one hundred years of operations.  Id.  Continental claimed that the contamination was not an accident, as required under the applicable policies, and the trial court granted summary judgment in Continental's favor.  Id. at 157.

On appeal, ENGI argued that the term "accident" in the policies was ambiguous, that the trial court improperly applied the "inherently injurious analysis," and that there were material factual disputes that precluded summary judgment.  Id. at 159. The New Hampshire Supreme Court reviewed its precedents as they applied to the meaning of "accident" in insurance policies.  Id. at 159-162.  The court noted that it had previously determined the definition of "accident" as "'an undesigned contingency, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected.'"  Id. at 160 (quoting Vermont Mut. Ins. Co. v. Malcolm, 128 N.H. 521, 523 (1986)).  In addition, accident had been construed to mean "'circumstances, not necessarily a sudden and identifiable event, that were unexpected or unintended from the standpoint of the insured.'"  Id. (quoting High Country Assocs. v. N.H. Ins. Co., 139 N.H. 39, 44 (1994)).  The supreme court ruled that those definitions controlled the meaning of accident, precluding ambiguity.  Id.

The court then addressed the inherently injurious analysis, taken from Vermont Mutual, which is used to determine whether injury that is not actually intentional is nevertheless not

9

accidental.  Id. at 161.  The court held that an injury is not accidental, in the context of determining insurance coverage, if either the insured actually intended, from a subjective standpoint, to cause the injury or if the act is inherently injurious, so that it is certain to cause injury, from an objective standpoint.  Id. at 162.  The court then concluded that ENGI's intentional dumping of tar and other waste in the Tar Pond at the Concord manufactured gas plant site was inherently injurious because the gas production industry was aware that their operations produced waste that could contaminate water to the extent of causing a nuisance.  Id. at 162-64.

The defendants argue that the New Hampshire Supreme Court established in Continental that the routine operations of all manufactured gas plants are inherently injurious and are not covered as accidents under liability policies.[2]  Based on that premise, the defendants assert that ENGI is collaterally estopped from litigating the issue of whether its operations in Dover were inherently injurious, and therefore, not accidental.  Alternatively, the defendants assert that the holding in

_____

[2]The defendants also cite and extensively quote decisions in other ENGI cases as "related actions."  Those cases pertain to other plant sites in New Hampshire, not the site in Dover.  Energy North Natural Gas, Inc. v. AEGIS, 95-591-B (D.N.H. June 5, 2002), cited and quoted by the defendants, involved claims pertaining to the same Concord site that was litigated in Continental, which supported the application of collateral estoppel in that case.

10

_Continental_ bars coverage here.  ENGI contends that _Continental_ does not preclude its claims here, which are based on different operations at a different site where, ENGI asserts, the contamination was predominately accidental.

### 1. Collateral estoppel.

Because the defendants rely on the preclusive effect of a state court judgment, this court applies state preclusion law. See _Patterson v. Patterson_, 306 F.3d 1156, 1158 (1st Cir. 2002). "The doctrine of issue preclusion, or collateral estoppel, operates to prevent a party to a prior action, or a person in privity with such a party, from relitigating any issue or fact actually litigated and determined in the prior action."  _NBAC Corp. v. Town of Weare_, 147 N.H. 328, 333 (2001).  "For collateral estoppel to apply, 'the issue subject to estoppel must be identical in each action, the first action must have resolved the issue finally on the merits, and the party to be estopped must have appeared in the first action, or have been in privity with someone who did.'"  _In re Wingate_, 813 A.2d 1176, 1180 (N.H. 2002) (quoting _Simpson v. Calivas_, 139 N.H. 1, 7 (1994)).

The defendants read the holding in _Continental_ too broadly. Instead of a general ruling applicable to all "routine operations" of all manufactured gas plants, the New Hampshire Supreme Court addressed a discrete factual situation pertaining to the operation of the Concord plant, and, even more

11

specifically, the intentional disposal of wastes into water that the manufactured gas industry understood to be injurious.  See, e.g., EnergyNorth v. Underwriters at Lloyd's, 2003 WL 1193060, at *1 (D.N.H. Mar. 13, 2003).  The defendants have not shown that the facts and circumstances pertaining to the contamination at issue in this case are sufficiently similar to those considered in Continental to support collateral estoppel.[3]  To the contrary, the record suggests that the circumstances at the Dover site are quite different from the deliberate discharge of tar and other wastes into the Tar Pond that occurred at the Concord plant, which was at issue in Continental.[4]  See LMI Mem. at 8-11. Therefore, the defendants are not entitled to summary judgment based on the doctrine of collateral estoppel with respect to the broad issue they have asserted.[5]

---

[3]Here, ENGI claims coverage for damage due to the unintentional release of contaminants caused by inadvertent leaks and spills, based upon the opinion of its expert witness, Dr. Shifrin.  Dr. Shifrin allocates the great majority of the contamination to inadvertent leaks and spills.  To the extent LMI's experts disagree with Dr. Shifrin, a material factual dispute exists, precluding summary judgment.

[4]It also appears that the plants were operated by different gas companies.

[5]The New Hampshire Supreme Court resolved a much narrower issue, namely that the gas manufacturing industry was aware "that its waste could contaminate water to the detriment of its neighbors" so that "a reasonable company in the position of ENGI at the time in question would have known that its intentional discharge of toxic waste into a body of water was certain to contaminate that body of water, particularly where, as here, that waste was known to be insoluble in water and tends to deposit on

2. Application of Continental.

    Relying on an order issued in EnergyNorth Natural Gas, Inc. v. Underwriters at Lloyd's, 97-64-M and 99-49-M, (D.N.H. June 14, 2002), which assessed the sufficiency of ENGI's allegations in support of its claims pertaining to plant sites in Laconia and Nashua, the defendants also contend that ENGI cannot prove that the contamination at the Dover site was accidental under the Continental standard.  In this case, ENGI is proceeding under RSA 491:22, which, as discussed above, puts the burden on the defendants to prove that the claimed damages are not covered under their policies.  See RSA 491:22-a.  Therefore, for purposes of the present motions, the defendant insurers, not ENGI, bear the burden of proof of non-coverage.

    To the extent the defendants have undisputed evidence of intentional dumping or discharge of wastes at the Dover site, those activities would not have been accidental and the damages resulting from those activities would not be covered by the policies.  Based on the summary judgment record, the purifier boxes were intentionally buried and the oil drippings were intentionally dumped on the ground near the river.  It does not appear, however, that ENGI is claiming coverage for its liability arising from those events.  Instead, ENGI is claiming coverage

---

the shores of a stream in the form of a shiny coating." Continental, 146 N.H. at 164.  ENGI does not appear to dispute the preclusive effect of that holding in this case.

for unintentional leaks and spills.  LMI has not shown, based on the Continental standard and the present record, that it is entitled to summary judgment with respect to ENGI's liability for damages arising from unintentional leaks and spills.

B.  Pollution Exclusion

The LMI policies include a pollution exclusion provision identified as "N.M.A. 1685."  Century's California Union policies follow form as to the LMI policies.  Two of the California Union policies include the N.M.A. 1685 exclusion as an endorsement, and two other California Union policies include an additional and different exclusion.

The N.M.A. 1685 exclusion provides that coverage is not available for damage or costs of removal or cleanup caused by seepage, pollution, or contamination unless "such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this Insurance."  LMI Mem. at 3; see also Century Mem. at 3.  The additional California Union exclusion states that its insurance does not apply to "damage arising out of pollution or contamination (1) caused by oil, or (2) caused by the discharge or escape of any other pollutants or contaminants, unless such discharge or escape results from a sudden happening during the policy period, neither expected nor intended from the standpoint of the insured." Century Mem. at 3.  Since Century merely joined in LMI's motion,

14

the separate language in the California Union policies has not been presented for summary judgment and will not be considered for purposes of the present motion.

LMI and Century argue that the N.M.A. 1685 pollution exclusion bars coverage here because ENGI and its predecessors intentionally discharged wastes into the environment, over a long period of time, as part of the regular business practices of a manufactured gas plant and used equipment that was known to leak, causing discharges of wastes. The result, they assert, is that the contamination at the site was not sudden, unintended, or unexpected as would be necessary to avoid the pollution exclusion. The defendants also contend that no "causative discharge" happened during the policy periods. ENGI argues that the N.M.A. 1685 exclusion is ambiguous and therefore does not bar coverage here.


1.  Standard.

The defendants' arguments require interpretation of the asserted pollution exclusion provision under New Hampshire law. The interpretation of the language of an insurance policy is a question of state law. Weeks v. Co-Operative Ins. Cos., 817 A.2d 292, 295 (N.H. 2003). "Where disputed terms are not defined in a policy or by State judicial precedent, [the court] appl[ies] an objective standard, construing the terms in context and as would a reasonable person in the position of the insured, based upon

15

more than a causal reading of the policy as a whole." Panciocco v. Lawyers Title Ins. Corp., 147 N.H. 610, 613 (2002). "If the language of a policy is reasonably susceptible to more than one interpretation and one interpretation favors coverage, the policy will be construed in favor of the insured and against the insurer." Hudson v. Farm Family Mut. Ins. Co., 142 N.H. 144, 146 (1997).

The defendants argue that New Hampshire's interpretive rule, which construes ambiguous policy language against the insurer, is not applicable in this case because ENGI's predecessor, GSI, bargained on an equal footing with LMI for the coverage at issue here. The New Hampshire Supreme Court adopted the ambiguity rule, for purposes of construing insurance policies, in Trombly v. Blue Cross/Blue Shield, 120 N.H. 764, 772 (1980). In that case, the court was asked to determine medical coverage in light of an asserted ambiguity in an exclusionary clause and a non-duplication provision. Acknowledging the rule of contract law that ambiguity is to be construed against the drafting party and noting the insurer's control over the policy provisions along with the general consideration that the object of insurance is to provide protection for the insured, the court concluded that ambiguities in insurance policy language are to be construed in favor of coverage. Id. at 771-72.

LMI and ENGI provide conflicting affidavits from insurance brokers who claim to have been involved in procuring insurance

16

coverage for GSI, during the relevant time period.[6]  It is at least disputed to what extent GSI was able to and did bargain for the terms of its LMI coverage.[7]

It is undisputed, however, that the pollution exclusion at issue here, N.M.A. 1685, is a standard form drafted by Lloyd's Non-Marine Association (N.M.A.), which appears in many insurance policies, and is not unique to the GSI policies.  See, e.g.,

_____

[6]LMI's suggestion, based on the affidavit of Peter S. Wilson, that the insurance brokers, representing clients such as Commonwealth Services, negotiated N.M.A. 1685 on behalf of GSI, is disputed by ENGI's counter-affidavit.  LMI lacks undisputed evidence that GSI was included as an insured on the Commonwealth Services policy or was represented as part of the Commonwealth Program.  LMI's arguments based on an "explosion rider," which was apparently part of the Commonwealth Services policy, and Wilson's explanation about negotiations on behalf of Commonwealth Services are not persuasive.  Cf. Town of Epping v. St. Paul Fire & Marine Ins. Co., 122 N.H. 248, 252 (1982) (Trombly presumption did not apply where insured expressly rejected coverage that it later claimed).  Similarly, notice to a different gas company about the effect of a pollution exclusion in a different insurance policy does not appear to be relevant here.  See EnergyNorth Natural Gas, Inc., 95-591-B, Order of July 1, 1999, at 17-18.

[7]LMI did not provide copies of the pertinent parts of the policies in question for this motion.  Copies of two Lloyd's policies included in the appendix to the motion addressing "damages" do not reference Commonwealth Services or Commonwealth Program.  The copies of purported "policy documents" submitted with LMI's reply are not sufficiently identified to be helpful or persuasive.  It remains unclear whether, or to what extent, GSI was included in the group represented by Commonwealth Services, whether it was part of the Commonwealth Program, and whether, or to what extent, it bargained for the terms in the LMI policies. Cf. EnergyNorth Natural Gas., 95-591-B (D.N.H. July 1, 1999) (granting summary judgment on "occurrence" without construing meaning against insurer due to evidence that ENGI's predecessor, not insurer, proposed policy language).

17

Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co., Ltd., 132 F.3d 526, 529 (9th Cir. 1997); Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 89 F.3d 976, 982 (3d Cir. 1996); Aetna Cas. & Sur. Co. v. Dow Chem. Co., 28 F. Supp. 2d 440, 443 (E.D. Mich. 1998); Icarom, PLC v. Howard County, Md., 981 F. Supp. 379, 383 (D. Md. 1997); EDO Corp. v. Newark Ins. Co., 898 F. Supp. 952, 955 (D. Conn. 1995); Cotter Corp. v. Am. Empire Surplus Lines Ins. Co., 64 P.3d 886, 889 (Colo. Ct. App. 2002), cert. granted Mar. 3, 2003); Murphy Oil USA, Inc. v. Unigard Sec. Ins. Co., 61 S.W.3d 807, 814 (Ark. 2001); Hercules, Inc. v. AIU Ins. Co., 784 A.2d 481, 496-97 (Del. 2001); Textron, Inc. v. Aetna Cas. & Sur. Co., 754 A.2d 742, 745 (R.I. 2000). In light of the dispute about GSI's bargaining power and the undisputed origin of the pollution exclusion, New Hampshire's ambiguity rule would appear to apply here. See Weaver v. Royal Ins. Co., 140 N.H. 780, 783 (1996) (holding that because drafter of exclusionary language "had the opportunity to define this language, [and] it chose not to do so, . . . the 'doubtful language is to be construed most strongly against the party who used it in drafting the contract'") (quoting Trombly, 120 N.H. at 771).

In addition, the purpose of the ambiguity rule under New Hampshire law is to protect the reasonable expectations of the insured by providing coverage. See Trombly, 120 N.H. at 771. Consonant with that purpose, an exclusion is effective only if it limits coverage in clear and unambiguous language so that "two

18

parties cannot reasonably disagree about its meaning." <u>Trombley v. Liberty Mut. Ins. Co.</u>, 813 A.2d 1202, 1204-05 (N.H. 2002). Therefore, the ambiguity rule is particularly applicable when construing the language of an exclusionary clause drafted by the insurer. <u>See</u> <u>Hoepp v. State Farm Ins. Co.</u>, 142 N.H. 189, 945 (1997). That appears to be the situation here.

2. <u>Interpretation.</u>

The defendants argue that the pollution exclusion bars coverage because the pollution at issue in this case was not caused by a "sudden, unexpected and unintended happening during the period of insurance." ENGI responds that the language is ambiguous and should be construed in favor of coverage. The dispute focuses on the meaning of "sudden" and of "happening."

The New Hampshire Supreme Court has not addressed the disputed language in the context of the N.M.A. 1685 pollution exclusion. No federal court has addressed that exclusion under New Hampshire law. Although courts in other jurisdictions have done so, neither the First Circuit Court of Appeals nor this court appears to have addressed the N.M.A. 1685 exclusion.

As a federal court sitting in diversity jurisdiction, this court may either certify an unresolved question of state law to the New Hampshire Supreme Court or predict that court's course, if that is "relatively clear." <u>Acosta-Mestre v. Hilton Int'l of P.R., Inc.</u>, 156 F.3d 49, 54 (1st Cir. 1998). Certification does

19

not appear to be warranted under the present circumstances.[8]  See Hugel v. Milberg, Weiss, Bershad, Hynes & Lerach, LLP, 175 F.3d 14, 18 (1st Cir. 1999).  "Consequently, "[the court] must make 'an informed prophecy of what the [New Hampshire Supreme Court] would do in the same situation,' seeking 'guidance in analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law.'" Walton v. Nalco Chemical Co., 272 F.3d 13, 20 (1st Cir. 2001) (quoting Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996)).

a. Sudden.

The New Hampshire Supreme Court has construed the phrase "sudden and accidental" in the context of property insurance for livestock.  Hudson v. Farm Family Mut. Ins. Co., 142 N.H. 144, 148 (1997).  In that case, the plaintiff's cows had developed medical problems due to the long-term effects of significant stray electrical voltage at the farm.  Id. at 145.  The plaintiff's insurance policy provided coverage for, among other things, "Sudden and Accidental Damage from Artific[i]ally

_____

[8]ENGI suggests certifying a narrow question to determine the meaning of "happening," but only in the event this court were not to find the term ambiguous as ENGI contends it is.  The court is satisfied that sufficient guidance is available to decide the issue without certification.

20

Generated Electrical Current."  Id.  The insurer argued that the injury to the cows was not sudden and accidental, as required by the policy language, because it was caused by long-term exposure to current.  Id. at 146.  The plaintiff argued that "sudden" in that context meant unexpected.  Id.

In Hudson, the supreme court referred to cases construing "sudden" in the context of pollution exclusion clauses in which some have given the term a temporal meaning, while others have held that "sudden" could "also be read to be synonymous with 'unexpected.'"  Id. at 147-48.  The court also referred to an insurance treatise which "instructs that '"sudden" is not to be construed as synonymous with instantaneous.'"  Id. at 148 (quoting 10A M. RHODES, COUCH ON INSURANCE 2D § 42:396 (rev. ed. 1982).  Acknowledging that construing "sudden" to mean unexpected was partially coextensive with "accidental," which also included unexpected in its meaning, the court noted that insurance policies often use language that is synonymous.  Id.  The court concluded that "sudden" was ambiguous and construed it as being synonymous with "unexpected."  Id. at 149.

As noted by the New Hampshire Supreme Court, courts differ, on the interpretation of "sudden" in pollution exclusion clauses, indicating that the term is ambiguous.[9]  See Hudson, 142 N.H. at

_____

[9]Other courts have considered the N.M.A. 1685 pollution exclusion and the standard American pollution exclusion as functionally equivalent.  See, e.g., Chem. Leaman Tank, 89 F.3d at 991; Aetna Cas. & Sur. Co., 28 F. Supp. 2d at 446 (citing cases); Textron, 754 A.2d at 750.

147; see also Textron, Inc., 754 A.2d at 748-49 (citing cases). Based on Hudson, and in particular on the court's reliance on the variety of interpretations of "sudden" in pollution exclusions as evidence of ambiguity, the New Hampshire Supreme Court would likely find "sudden" to be ambiguous as used in the N.M.A. 1685 exclusion in the policies at issue here. See, e.g., Patz v. St. Paul Fire & Marine Ins. Co., 15 F.3d 699, 703 (7th Cir. 1994) (applying Wisconsin's highest court's interpretation of "sudden" in pollution exclusion case).

The pollution from the Dover site has apparently occurred gradually, at least in part, due to leaks, seepage, and spills. As is discussed above, the defendants have not established that the pollution was entirely or even in the most part intentional. If "sudden" were construed to have a temporal meaning, as in abrupt, the pollution exclusion would likely bar coverage here. On the other hand, if "sudden" were construed to mean unexpected, the pollution exclusion would not bar coverage as long as the "happening" was unexpected and unintended. Because the interpretation of "sudden" to mean "unexpected" would more likely allow coverage in this case, as in Hudson, that is the more likely course the New Hampshire Supreme Court would follow. Therefore, the defendants have not demonstrated that the N.M.A. 1685 pollution exclusion bars coverage in this case based on the interpretation of "sudden."

22

b.  Happening.

The remaining dispute as to the pollution exclusion pertains to the meaning of "happening" in the context of "where such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this insurance."  LMI Poll. Mem. at 3 (emphasis added).  LMI argues that "happening" is "actor neutral" and that "happening" is the "causative release of pollutants" which must take place within an applicable policy period.  Because the Dover plant closed before any of the LMI policies were in effect, LMI contends that no causative discharges occurred during any of the policy periods.[10] ENGI argues that "happening" must be construed from the perspective of the insured and that the term is ambiguous and should be construed in favor of coverage.

LMI's theory that "happening" must be construed as "actor neutral" is incomprehensible.  It appears, based on the cases cited, that LMI may intend to distinguish between the discharge of pollutants and the resulting damage.  Because "happening" is modified by "sudden, unexpected and unintended," it necessarily must be interpreted from some perspective, which most reasonably would be from the perspective of the insured.  See Wallis, 986 P.2d at 934.

ENGI relies on the New Hampshire Supreme Court's

_____

[10]The parties do not appear to have addressed the question of when the tanks might have first started leaking or whether they continue to leak.

23

interpretation of an "absolute" pollution exclusion in <u>Weaver</u>, which barred coverage for injury "'arising out of the actual, alleged, or threatened discharge, dispersal, release or escape of pollutants.'" <u>Id.</u> at 782 (quoting policy language). In <u>Weaver</u>, parents sought to recover from the father's business liability policy for the lead poisoning of their infant son. <u>Id.</u> at 781. The father was a commercial painter, and the baby ingested lead paint particles and dust that the father inadvertently carried home from his work on his clothing and paint tarps. <u>Id.</u>

The parties disputed the meaning of "discharge, dispersal, release or escape" in the pollution exclusion. <u>Id.</u> at 782. The plaintiffs argued the phrase referred to environmental contamination, not the poisoning that had occurred in that case. <u>Id.</u> The defendant argued that the phrase was not limited to environmental contamination and included the spread of lead paint and dust generated by the father's business activity. <u>Id.</u> at 783. The court concluded that both interpretations were reasonable and "that the pollution exclusion is ambiguous when applied to the facts of this case." <u>Id.</u>

The facts of the present case are materially different from the circumstances in <u>Weaver</u>. Here, it is undisputed that the pollution at issue is environmental contamination. Therefore, the holding in <u>Weaver</u> does not control the outcome here.

LMI's interpretation of "happening," as the initial causative discharge, rather than the resulting harm, is supported

24

by the First Circuit's analysis in <u>St. Paul Fire & Marine Ins. v. Warwick Dyeing</u>, 26 F.3d 1195, 1203 (1st Cir. 1994).  ENGI has not offered an interpretation of "happening" in the context of this case to counter LMI's well-supported interpretation.  As only one reasonable interpretation has been offered, no ambiguity has been demonstrated.  Therefore, to the extent ENGI claims coverage arising from pollution that was not caused by an unexpected and unintended happening and the LMI pollution exclusion applies, that exclusion bars coverage.  LMI and other defendants whose policies include or follow form as to the LMI exclusion are entitled to summary judgment on claims barred by the exclusion.

C.  <u>Costs Not Covered as Damages</u>

LMI's policies for the period between December 4, 1958, and July 1, 1960, agreed to pay "for damage to or destruction of property of others" and incorporated the language of primary insurance policies that excluded coverage for damage to "premises alienated by the named insured."  LMI Damages Mem. at 5.  The LMI policies for the period between January 1, 1962, and January 29, 1979, agreed to indemnify the insured for damage to property but excluded damage to property owned by the insured.  Based on that policy language, known as an "owned property" exclusion, LMI, joined by Century and Northern Assurance Company, contend that those policies do not cover damages arising from investigating or remediating pollution on ENGI's property or property formerly

25

owned by ENGI or GSI.  They also contend that under New Hampshire law costs incurred to prevent pollution are not damages.

1.  "Owned property" exclusion.

ENGI contends that LMI's motion is premature because at present it is unknown which response costs are aimed at onsite or offsite pollution.  In addition, ENGI notes that the "owned property" exclusion does not apply to costs associated with remediating contamination of groundwater, of the river, and of property that was never owned by ENGI or GSI.  ENGI disputes LMI's argument that response costs for remediation that occurs on ENGI's property are not damages.

The "owned property" exclusion does not apply to bar coverage for an insured's liability for damage to adjacent property, when that property is not in the possession or control of the insured.  See U.S. Fid. & Guar. Co., Inc. v. Johnson Shoes, Inc., 123 N.H. 148, 153-54 (1983) (holding that damage to adjacent property caused by oil seeping from insured's property not excluded by owned property exclusion).  It appears to be well-established that pollution damage to groundwater is not excluded by the "owned property" exclusion.  See, e.g., Reese v. Travelers Ins. Co., 129 F.3d 1056, 1061 (9th Cir. 1997); Figgie Int'l, Inc. v. Bailey, 25 F.3d 1267, 1271 (5th Cir. 1994); Cargill, Inc. v. Evanston Ins. Co., 642 N.W.2d 80, 90 (Minn. 2002); Muralo Co., Inc. v. Employers Ins. of Sausau, 759 A.2d

26

348, 352 (N.J. Sup. Ct. 2000).  In addition, most courts have concluded that the "owned property" exclusion does not bar coverage for onsite cleanup or remediation to remediate contamination of groundwater or adjacent property.  See, e.g., Anderson Dev't Co. v. Travelers Indem. Co., 49 F.3d 1128, 1133-34 (6th Cir. 1995); Patz, 15 F.3d at 705; Quincy Mut. Fire Ins. Co. v. Borough of Bellmawr, 799 A.2d 499, 510 (N.J. 2002);  Hakim v. Mass. Ins. Insolvency Fund, 675 N.E.2d 1161 1164 (Mass. 1997). It is likely that the New Hampshire Supreme Court would follow the majority position.

Therefore, LMI has not shown that it is entitled to summary judgment, based on the "owned property" exclusion, as to costs claimed for clean-up, abatement, or remediation of contamination of the groundwater, the river, or adjacent properties. Similarly, the "owned property" exclusion does not bar recovery for on-site efforts to clean up or remediate pollution or contamination of the groundwater, the river, or adjacent properties, except, as is discussed below, preventative measures are not included in damages.

2.  Definition of damages.

Under New Hampshire law, costs of remediating contamination or pollution and related investigatory expenses are damages for purposes of comprehensive general liability policies.  Coakley v. Maine Bonding & Cas. Co., 136 N.H. 402, 416 (1992).  In contrast,

27

preventative costs, incurred to investigate and prevent future pollution or contamination, are not damages. Id.; see also M. Mooney Corp. v. U.S. Fidelity & Guar. Co., 136 N.H. 463, 467 (1992). LMI seeks summary judgment to the extent ENGI claims preventative costs as damages.

In Coakley, the New Hampshire Supreme Court held that the distinction between remedial and preventative costs permitted coverage for the costs of collecting and treating groundwater contaminated by the landfill but not the costs of investigating and installing a cap over the landfill to prevent further contamination. 136 N.H. at 416. The parties agree that so far no plan is in place for addressing the contamination at the Dover site. Therefore, this case lacks a factual basis to apply the Coakley standard, precluding summary judgment.

## Conclusion

For the foregoing reasons, LMI's motion for summary judgment based on the pollution exclusion (document no. 133) is granted to the extent that policies that include that exclusion bar coverage except for an initial discharge of pollutants within the policy period. The motion is otherwise denied.

LMI's motion for summary judgment on damages (document no. 131) is granted to the extent that costs for preventative measure are not included as damages and is otherwise denied.

LMI's motion for summary judgment on the issue of "accident,

28

occurrence, and fortuity" (document no. 132) and on the issue of damages (document no. 131) are denied.

Because a hearing on the motions for summary judgment would not be of assistance to the court, ENGI's request for a hearing is denied.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

July 16, 2003

cc:  Bruce W. Felmly, Esquire
     Eric A. Kane, Esquire
     Jeffrey P. Heppard, Esquire
     Charles P. Bauer, Esquire
     John D. Frumer, Esquire
     Robert P. Firriolo, Esquire
     Doreen F. Connor, Esquire